# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *     MIS CASE NO. <u>26-113</u>

V.     *     SECTION O(3)

SUSAN HUTSON, in her official capacity *     JUDGE LONG
as, ORLEANS PARISH CRIMINAL     *
SHERIFF     *     MAGISTRATE JUDGE DOSSIER

## <u>DEFENDANT'S MEMORANDUM IN OPPOSITION</u><br><u>TO PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

ARGUMENT .................................................................................................................. 4

I.    The Administrative Subpoenas At Issue Do Not Satisfy The Standard For Judicial Enforcement. ............................................................................... 4

    A.    The administrative subpoenas are beyond ICE's statutory and regulatory authority........................................................................... 5

        1.    Requests that OPSO produce detainees as "witnesses" exceed ICE's statutory and regulatory authority. .......................... 5

        2.    Requests that OPSO generate a "roster" of detainees without documented legal status exceed ICE's statutory and regulatory authority........................................................................ 9

    B.    The administrative subpoenas are unduly burdensome. ......................... 10

    C.    The administrative subpoenas seeking witness testimony were issued for an improper purpose. .............................................................. 11

II.    Compelling Enforcement Of The Administrative Subpoenas Would Violate The Tenth Amendment. .................................................................. 12

III.    Compliance With The Subpoenas Is Constrained By The *Cacho* Consent Decree. ....................................................................................................... 16

CONCLUSION................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beverly v. United States*,
    468 F.2d 732 (5th Cir. 1972) ...................................................................11

*Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*,
    983 F.2d 631 (5th Cir. 1993) ...................................................................4

*CFPB v. Source for Pub. Data, L.P.*,
    903 F.3d 456 (5th Cir. 2018) ...................................................................5

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018) ...............................................................12, 13

*erinMedia, LLC v. Nielson Media Research, Inc.*,
    No. 05-CV-1123-T-24, 2007 WL 1970860 (M.D. Fla. July 3, 2007) ......................9

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014)..................................................................13

*Johnson v. E. Carroll Det. Ctr.*,
    658 So. 2d 724 (La. Ct. App. 1995)...........................................................6

*Leonard v. Martin*,
    38 F.4th 481 (5th Cir. 2002) ...................................................................9

*Lopez-Lopez v. Cnty. of Allegan*,
    321 F. Supp. 3d 794 (W.D. Mich. 2018) .....................................................13

*Mir v. L-3 Commcn's Integrated Sys., L.P.*,
    319 F.R.D. 220 (N.D. Tex. 2016) ..............................................................9

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018)...........................................................................12

*New York v. United States*,
    505 U.S. 144 (1992)...........................................................................12

*Porter v. Becnel*,
    No. CV 15-69-JWD-RLB, 2016 WL 1729549 (M.D. La. Jan. 15, 2016) ...............16

*Printz v. United States*,
    521 U.S. 898 (1997)...............................................................1, 10, 12, 14, 15, 16

*Reno v. Bossier Par. Sch. Bd.*,
    528 U.S. 320 (2000)..................................................................................9

*Story v. Robinson*,
    689 F.2d 1176 (3d Cir. 1982)...................................................................6

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) .................................................................13

*United States v. Chevron U.S.A., Inc.*,
    186 F.3d 644 (5th Cir. 1999) .................................................................10

*United States v. Cruz-Jiminez*,
    977 F.2d 95 (3d Cir. 1992).......................................................................6

*United States v. Garrard*,
    83 F.3d 889 (7th Cir. 1996) .....................................................................6

*United States v. Gotti*,
    784 F. Supp. 1011 (E.D.N.Y. 1992) ........................................................6

*United States v. Guerra Castillo*,
    No. CR JKB-16-0259, 2019 WL 6872927 (D. Md. Dec. 16, 2019)..........9

*United States v. Minker*,
    350 U.S. 179 (1956)................................................................................8

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950)................................................................................4

*United States v. Multnomah Cnty. Dep't of Cmty. Just.*,
    No. 6:25-CV-01784-MC, 2025 WL 3267361 (D. Or. Nov. 24, 2025)......9

*United States v. Powell*,
    379 U.S. 48 (1964)................................................................................11

*United States v. Rinchack*,
    820 F.2d 1557 (11th Cir. 1987) ...............................................................6

*U.S. Immigr. & Customs Enf't v. Gomez*,
    445 F. Supp. 3d 1213 (D. Colo. 2020)...............................................15, 16

**Statutes and Regulations**

8 C.F.R. § 287.4(b) ....................................................................................1, 7, 8

8 C.F.R. § 287.4(b)(1)....................................................................................7, 9

8 C.F.R. § 287.4(b)(2)........................................................................................7

8 C.F.R. § 287.7(d) ...............................................................................1, 3, 11, 13

8 U.S.C. § 1225(d)(4)(A)..............................................................................5, 9

8 U.S.C. § 1225(d)(4) ...............................................................1, 6, 9, 10, 13, 14

18 U.S.C. § 3626(e) ..............................................................................................17

Fed. R. Civ. P. 45 ....................................................................................................9

La. Code Civ. Proc. art. 1235.1 .............................................................................6

**Other Authorities**

9 James W. Moore et al., Moore's Federal Practice § 45.10 (Matthew Bender 3d
ed. 2021) ...........................................................................................................9

Black's Law Dictionary Online (12th ed. 2024) .....................................................9

Joshua Goodman & Tim Sullivan, *Migrants Thought They Were in Court for a
Routine Hearing. Instead, It Was a Deportation Trap*, ASSOCIATED PRESS,
Nov. 19, 2025, https://tinyurl.com/bda8pfpy ..................................................11

Lindsay Nash, *The Immigration Subpoena Power*, 125 Colum. L. Rev. 1, 37
(2025) .............................................................................................................16

Maanvi Singh & Will Craft, *As Deportations Ramp Up, Immigrants Increasingly
Fear ICE Check-Ins: 'All Bets Are Off,'* THE GUARDIAN, Apr. 6, 2025,
https://tinyurl.com/4yeptj8b ...........................................................................11

National Immigration Law Center, *Warrants and Subpoenas: What to Look Out
for and How to Respond* (Jan. 2025), https://tinyurl.com/4baznuu7 .............7, 8

## INTRODUCTION

U.S. Immigration and Customs Enforcement (ICE) issued a series of administrative subpoenas to the Orleans Parish Sheriff's Office (OPSO) that seek to compel OPSO to create and maintain a "roster" of detainees without documented legal status for ICE's use; to compel OPSO to deliver certain OPSO detainees into ICE's custody, allegedly for witness interviews; and to otherwise submit copious records to ICE. The petition, however, fails to cite any case enforcing subpoenas of like-kind. ICE's petition to enforce the subpoenas should be denied.

To begin, ICE's subpoenas exceed the statutory authorization granted under 8 U.S.C. § 1225(d)(4) because a subpoena is not the proper vehicle for directing a custodian to produce a detainee to provide testimony as a witness, nor may a subpoena direct the creation of documents that do not already exist. ICE's subpoenas also fail to comply with the procedural requirements in 8 C.F.R. § 287.4(b), in part because they were not issued on the required Form I-138. In addition, the subpoenas at issue here are unduly burdensome and were issued for an improper purpose, namely to circumvent the limits on ICE's ability to compel compliance with ICE detainers under 8 C.F.R. § 287.7(d). Further, the ICE subpoenas effectively "command" OPSO to "enforce a federal regulatory program" in a way that violates the Tenth Amendment's anti-commandeering principle. *Printz v. United States*, 521 U.S. 898, 935 (1997). Finally, compliance with the ICE subpoenas is constrained by the terms of the consent decree governing OPSO's cooperation with ICE.

## BACKGROUND

At issue in this litigation is the validity of three categories of administrative subpoenas issued by ICE to OPSO. First, ICE has issued subpoenas to OPSO seeking "the production of" six

"identified aliens" to ICE's offices for interviews "as a witness." Declaration of Brian S. Acuna ¶¶ 15, 23-60; R. Doc. 1-2 at 18-20, 23-25, 28-30, 33-35, 38-40, 43-45.[1]

Second, ICE has issued subpoenas to OPSO seeking the "production of documents associated with" nine specific individuals. Acuna Decl. ¶¶ 15, 23-74; R. Doc. 1-2 at 21-22, 26-27, 31-32, 36-37, 41-42, 46-53. Those subpoenas request, in particular:

> (A) Documents sufficient to show [the individual's] home address; employment address; country of birth; date of birth; Information obtained from identification documents (the drivers license number and state, foreign identification document card number and country, passport number and country); copies of all documents on their person when arrested; bond information to include obligor name and address; FBI number; Emergency Contact name, address and telephone number;
>
> (B) Documents to show the criminal charge related to [the individual's] detention … including arrest report or 'gist,' booking sheets, booking photos, probable cause statements, release agreements, and bond or surety documents.

*E.g.*, R. Doc. 1-2 at 21.

Third, ICE has issued subpoenas to OPSO seeking "lists [of] inmates in OPSO custody who have failed to provide verifiable identity documents that correspond with lawful presence in the United States." Acuna Decl. ¶¶ 75-86; Dkt. 1-2 at 54-63. The subpoenas refer to this as a "[r]oster of alien inmates" in OPSO custody. *E.g.*, R. Doc. 1-2 at 62. According to ICE, "[t]he rationale for requesting a roster of inmates from OPSO is to ascertain the identities of potential aliens in their custody who have not yet been encountered by immigration officials." Acuna Decl. ¶ 76. These subpoenas amount to "asking OPSO to identify individuals who may be aliens." *Id.* ¶ 78. ICE has issued numerous sequential subpoenas for this "roster" of inmates; as ICE explains, it "issued serial subpoena requests to OPSO for this information because OPSO's inmates lists would likely change day-to-day, and week-to-week." *Id.* ¶ 85.

---

[1] Unless otherwise noted, citations to the exhibits attached to the Acuna Declaration refer to the ECF-stamped pagination of R. Doc. 1-2 for ease of identification.

OPSO did not comply with the ICE administrative subpoenas at issue in this litigation. Acuna Decl. ¶¶ 87-91. Among other things, OPSO conveyed to ICE that its ability to comply with the ICE subpoenas was constrained by a consent decree in separate litigation. *Id*. ¶ 90. Specifically, persons in OPSO's custody filed suit in 2011 against then-Sheriff Marlin Gusman (since replaced by Defendant, Sheriff Susan Hutson) over OPSO's policy related to ICE detainers. *See generally Cacho et al. v. Gusman*, No. 11-cv-225 (E.D. La.) ("*Cacho*"). Such detainers authorize (but do not require) law enforcement agencies to "maintain custody" of individuals subject to the detainer "for a period not to exceed 48 hours" "in order to permit assumption of custody by" federal immigration officials. 8 C.F.R. § 287.7(d). The *Cacho* plaintiffs alleged that OPSO had a policy of "holding individuals [subject to ICE detainers] in indefinite detention … beyond [the] 48 hours" authorized by the detainer. *See Cacho* R. Doc. 1 ¶¶ 2, 26-32, 42-47. The *Cacho* litigation culminated in a consent decree requiring OPSO to adopt a revised policy to govern cooperation with ICE. *Cacho* R. Doc. 96 ¶ 4. Specifically, the consent decree requires OPSO to "decline all voluntary ICE detainer requests unless the individual's charge is for" certain offenses enumerated in the consent decree. *Cacho* R. Doc. 96-2 ¶ 2.1 It further requires OPSO to "not initiate any immigration status investigation into individuals in OPSO custody or affirmatively provide information on an inmate's release date or address to ICE." *Id*. ¶ 3. It also establishes procedural protections, including notice and access to counsel before certain ICE interviews. *Id*. ¶¶ 3-4.

Although the consent decree limits the extent to which OPSO can honor ICE detainers, ICE has continued to submit detainers to OPSO. According to ICE, it submitted 170 detainers to OPSO between 2022 and 2025, and OPSO honored only two. *See* Acuna Decl. ¶¶ 12-13. Purportedly "[b]ased upon OPSO's prior failures to honor [those] ICE detainers," ICE issued the

administrative subpoenas at issue here. *Id*. ¶ 14. OPSO then informed ICE that it could not comply

with the subpoenas under the *Cacho* consent decree. *Id.* ¶ 90.

This petition followed. Among other things, the petition argues that the *Cacho* consent

decree does not bar compliance with ICE's subpoenas because "the terms of the consent decree

are stayed by operation of the Prison Litigation Reform Act" (PLRA). R. Doc. 1-1 at 15. Shortly

after the United States filed this petition, the court in the *Cacho* litigation held the PLRA to be

"inapplicable" to the *Cacho* plaintiffs' suit. *Cacho* R. Doc. 178 at 18. The *Cacho* court also

certified to the Louisiana Supreme Court several questions of state law concerning both the consent

decree's validity following the enactment of Louisiana Act 314 and Act 314's validity in light of

various provisions of the Louisiana Constitution. *Id.* The consent decree remains in effect pending

resolutions of those questions of state law. *Id*.

## ARGUMENT

### I.    The administrative subpoenas at issue do not satisfy the standard for judicial enforcement.

"[C]ourts will enforce an administrative subpoena if: (1) the subpoena is within the

statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry;

and (3) the demand is not unreasonably broad or burdensome." *Burlington N. R. Co. v. Off. of

Inspector Gen., R.R. Ret. Bd*., 983 F.2d 631, 638 (5th Cir. 1993) (citing *United States v. Morton

Salt Co.*, 338 U.S. 632, 652 (1950)). "Courts will not enforce an administrative subpoena,

however, if the above requirements are not met or if the subpoena was issued for an improper

purpose, such as harassment." *Id*. The administrative subpoenas at issue fail to satisfy the

necessary requirements and were issued for an improper purpose. The court therefore should

decline to enforce the subpoenas.

4

### A.    The administrative subpoenas are beyond ICE's statutory and regulatory authority.

"An administrative agency's authority to issue subpoenas is a creature of statute." *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018). 8 U.S.C. § 1225(d)(4)(A) provides the sole basis for ICE's subpoena power, authorizing the "Attorney General and any immigration officer … to require by subpoena" the following: (i) "the attendance and testimony of witnesses before immigration officers," and (ii) "the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the [INS]." These four sources—testimony of witnesses, books, papers, and documents—constitute the entire universe of information that ICE may demand in an administrative subpoena. The petition argues that the subpoenas fall within the "broad scope of inquiry authorized by Congress," because ICE is "investigating aliens who it has probable cause to believe are removable," and "ICE is authorized to investigate these aliens." R. Doc 1-1 at 10-11. But that focuses on just one aspect of the subpoena power—the relevance of the requested materials to ICE's investigation. Nowhere does the petition establish ICE's statutory authority to request the *particular forms of evidence* sought in the subpoenas at issue here. In fact, the administrative subpoenas exceed the authority expressly granted in § 1225(d)(4)(A) and should not be enforced.

### 1.    Requests that OPSO produce detainees as "witnesses" exceed ICE's statutory and regulatory authority.

The ICE subpoenas' directive to produce individuals in OPSO's custody for witness interviews falls outside the scope of ICE's statutory subpoena power. In general, courts have recognized that the "subpoena process, which runs only to the witness, cannot be effective" with respect to witnesses who "are in state custody"; instead, the process must "run[] to the custodian."

*Story v. Robinson*, 689 F.2d 1176, 1179 (3d Cir. 1982). And the proper process for directing a detainee's custodian (i.e., their detention facility) to produce a detainee for testimony is the writ of habeas corpus *ad testificandum*. *See id.*; *United States v. Rinchack*, 820 F.2d 1557, 1567 n.13 (11th Cir. 1987) (observing that a "witness subpoena orders the individual whose testimony is sought to attend the trial, while a writ of habeas corpus *ad testificandum* runs *to* the custodian of the potential witness"); *United States v. Garrard*, 83 F.3d 889, 893 (7th Cir. 1996) (similar); *United States v. Cruz-Jiminez*, 977 F.2d 95, 99 n.5 (3d Cir. 1992) (similar); *United States v. Gotti*, 784 F. Supp. 1011, 1012 (E.D.N.Y. 1992) (similar). Here, the subpoenas do not seek "the attendance and testimony of" the recipient of the subpoena, namely OPSO. *See* 8 U.S.C. § 1225(d)(4)(A). They instead seek to force OPSO to produce persons in its custody. For the foregoing reasons, ICE's subpoenas are improper; indeed, they are not subpoenas at all. *See, e.g.*, *Garrard*, 83 F.3d at 893 (observing that a subpoena, by its nature, orders *the recipient* to appear as a witness).

The petition largely ignores this problem. In a footnote, it claims in passing that ICE served witness-production subpoenas on OPSO instead of the detainees it seeks to interview pursuant to Article 1235.1 of the Louisiana Code of Civil Procedure. R. Doc. 1-1 at 3 n.1. But that state provision regards service of process of incarcerated persons in state litigation generally (*e.g.*, how to serve a final judgment on an inmate) and would not require any further action. *See, e.g.*, *Johnson v. E. Carroll Det. Ctr.*, 658 So. 2d 724, 727 (La. Ct. App. 1995). The subpoenas here were not issued in connection with any state-court litigation, so the Louisiana Code of Civil Procedure has no apparent relevance. And Article 1235.1 would not apply even on its own terms because ICE did not serve OPSO with subpoenas directed to the supposed witness; the subpoenas are directed to OPSO itself. *See, e.g.*, R. Doc. 1-2 at 18. More fundamentally, the rules of civil procedure

operable in Louisiana state court do not expand the scope of ICE's authority under 8 U.S.C. § 1225(d)(4).

The Department of Homeland Security regulation governing the issuance of subpoenas for witness testimony confirms that the subpoenas here are improper. Under that regulation, a subpoena issued as part of a criminal or civil investigation can command only the "person or entity *to which it is addressed* to attend and to give testimony at a time or place specified." 8 C.F.R. § 287.4(b)(1) (emphasis added). And the regulation makes doubly clear in the next subdivision that "[e]very subpoena issued under the provisions of this section … shall command the *person to whom it is directed* to attend and to give testimony." § 287.4(b)(2) (emphasis added). The subpoenas requesting that OPSO produce detainees as "witnesses" are addressed to the deputy chief of corrections for OPSO, however—not to the detainees themselves. *See, e.g.*, R. Doc. 1-2 at 18.

In addition, the fact that the witness-production subpoenas here do not follow DHS's regulation specifying the "[f]orm of subpoena" for compelling witness testimony reinforces that the subpoenas exceed ICE's authority. 8 C.F.R. § 287.4(b). The regulation is unequivocal: "All subpoenas shall be issued on Form I-138." 8 C.F.R. § 287.4(b). While the document-production subpoenas bear a notation identifying the form as "DHS Form I-138 (6/09)," *see, e.g.*, R. Doc. 1-2 at 21, the witness-production subpoenas do not, *see, e.g.*, R. Doc. 1-2 at 18. This is not a mere oversight; these subpoena forms diverge from the requirements of Form I-138 in key respects—because Form I-138 does not accommodate ICE's unlawful request for OPSO to produce detainees for interviews.

For example, Form I-138 provides two options for the issuing officer to check: The subpoena can command the recipient of the subpoena to "appear" to produce testimony and/or to

"produce" enumerated categories of documents. *See, e.g.*, R. Doc. 1-2 at 21; *see also* National Immigration Law Center, *Warrants and Subpoenas: What to Look Out for and How to Respond* 20 (Jan. 2025), https://tinyurl.com/4baznuu7 (reproducing sample of DHS Form I-138 (6/09) in Appendix D). That makes sense, because a subpoena recipient and the person commanded to appear or produce documents must be one and the same.[2] Consequently, Form I-138 does not list as an option requiring the recipient to produce *another person* for an interview (undoubtedly because such a request is outside of ICE's statutory and regulatory authority, *see supra* 5-7). Thus, ICE could not use Form I-138 to issue its request and had to resort to an unauthorized bespoke form in violation of 8 C.F.R. § 287.4(b).

Form I-138 further specifies the "CBP, ICE or USCIS Official before whom [the recipient of the subpoena is] required to appear," as well as an exact date and time for the appearance. *See, e.g.*, R. Doc. 1-2 at 21; *see also* National Immigration Law Center, *supra*, at 20 (sample Form I-138). The subpoenas here, by contrast, do not specify the immigration official before whom the witness is supposed to appear, nor an exact date and time for the witness' appearance, instructing instead that OPSO produce the detainee witness "as early as practicable (at least 48 hours, if possible) before the individual is released from [OPSO's] custody" and "between the hours of 8 a.m. and 4 p.m., Central Standard Time." *See, e.g.*, R. Doc. 1-2 at 18.

In sum, the relevant statute, regulation, and required subpoena form all make clear that ICE does not have the power to direct OPSO to produce detainees for interviews through an administrative subpoena.

---

[2] The subpoenas demand the compliance of Deputy Chief of Corrections Jeworski Mallet. However, Petitioner seeks the enforcement of these subpoenas against Sheriff Susan Hutson.

### 2. Requests that OPSO generate a "roster" of detainees without documented legal status exceed ICE's statutory and regulatory authority.

As the U.S. Supreme Court has recognized, the power to issue administrative subpoenas in the immigration context is "capable of oppressive use" and possesses "some coercive tendency." *United States v. Minker*, 350 U.S. 179, 187 (1956). Accordingly, that subpoena power should not be expanded beyond the authorizing statute and established norms.

The statute at issue here, 8 U.S.C. § 1225(d)(4)(A), authorizes the issuance of a subpoena to require "the production of books, papers, and documents." The statute's implementing regulations similarly address its "command … to produce the books, papers, or documents specified in the subpoena." *E.g.*, 8 C.F.R. § 287.4(b)(1). In the legal context, the "production" of documents refers to "[t]he action of exhibiting or bringing forward a document." *Production*, Black's Law Dictionary Online (12th ed. 2024); *cf.* Fed. R. Civ. P. 45. And as relevant here, previous judicially enforced subpoenas under § 1225(d)(4) have directed the recipient to turn over existing documents—as opposed to creating new documents from information available to the recipient. *See*, *e.g.*, *United States v. Multnomah Cnty. Dep't of Cmty. Just.*, No. 6:25-CV-01784, 2025 WL 3267361, at *1, *3 (D. Or. Nov. 24, 2025); *United States v. Guerra Castillo*, No. CR JKB-16-0259, 2019 WL 6872927, at *2 (D. Md. Dec. 16, 2019). The same is true with subpoenas more generally, which may direct the recipient to produce records "already in existence," not "*create* [a] document or thing in the first instance." *Leonard v. Martin*, 38 F.4th 481, 490 & n.7 (5th Cir. 2022) (quoting 9 James W. Moore et al., *Moore's Federal Practice* § 45.10 (Matthew Bender 3d ed. 2021)) (discussing Rule 45 subpoenas); *Mir v. L-3 Commcn's Integrated Sys., L.P.*, 319 F.R.D. 220, 227 (N.D. Tex. 2016) (party or nonparty cannot be required via subpoena to "'create documents that do not exist'" (collecting cases)). That is, in part, because a subpoena "addresses itself to documents in existence as of the date the subpoena is responded to." *erinMedia,*

*LLC v. Nielson Media Rsch., Inc.*, No. 05-CV-1123-T-24, 2007 WL 1970860, at *4 (M.D. Fla. July 3, 2007).

Because courts may not "attribute different meanings to the same phrase in the same sentence," the word "production" cannot be construed differently across different applications of § 1225(d)(4). *See Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000). Stated otherwise, the word "production" in § 1225(d)(4) cannot sometimes mean one thing (i.e., turn over documents) and sometimes mean another (i.e., create documents).

The present subpoena asks OPSO to *generate* a list containing specifically requested information—such as "date of birth, demographic information, address, … [and] passport numbers" —of detainees "who have failed to provide verifiable identity documents" establishing legal status, *see, e.g.*, R. Doc. 1-2 at 54. Because such a list does not already exist, the statute's authorization for subpoenas requesting "the production of books, papers, and documents" does not encompass ICE's request that OPSO *generate* this roster. The fact that ICE's "roster" subpoenas, like the witness-production subpoenas, were not issued on Form I-138, *see* R. Doc. 1-2 at 54; *supra* 7-8, reinforces that these subpoenas are invalid.

### B.    The administrative subpoenas are unduly burdensome.

A subpoena is unduly burdensome if "compliance threatens to unduly disrupt or seriously hinder normal operations." *United States v. Chevron U.S.A., Inc.*, 186 F.3d 644, 649 (5th Cir. 1999) (citation omitted). That is the case here. The ICE declaration in this case acknowledges that ICE has issued "serial" subpoenas to OPSO on an almost weekly basis requiring continual and indefinite updates because the information ICE is requesting "would likely change day-to-day, and week-to-week." Acuna Decl. ¶ 85. Diverting OPSO resources to provide continual and indefinite immigration-status updates regarding detainees in OPSO's custody is sure to disrupt normal OPSO operations. *Cf. Printz*, 521 US. at 922, 930 (noting the disruptive effects of a federal government

10

effort to force a continuous transmission of information from state and local law enforcement). Likewise, the subpoena provision seeking for OPSO personnel to transport persons to ICE's New Orleans office, wait while ICE interviews them, and then transport them back (assuming ICE does not use such interviews as a pretext for arrest and detention), plainly requires a diversion of vehicles, personnel, and other resources from OPSO's operations.

### C. The administrative subpoenas seeking witness testimony were issued for an improper purpose.

Beyond the fact that subpoenas to OPSO are not the proper vehicle for obtaining testimony from detainees in OPSO's custody, *see supra* 5-8, OPSO believes that the administrative subpoenas here are not directed at obtaining testimony at all. Mr. Acuna admits that ICE issued the administrative subpoenas here "[b]ased upon OPSO's prior failure[] to honor ICE detainers," and only with respect to "identified aliens on whom ICE also issued detainers." Acuna Decl. ¶ 14. Further, the administrative subpoenas themselves provide that, "[i]n lieu of [OPSO] bringing the witness" to ICE, OPSO "may arrange for an immigration officer to receive the witness directly from the facility where the witness will be released from your custody." *E.g.*, R. Doc. 1-2 at 18. Viewed in context, the subpoenas may amount to an attempted end-run around the limitations of ICE detainers under both 8 C.F.R. § 287.7(d) and the OPSO consent decree, if ICE plans to arrest and detain OPSO inmates when they are produced for their supposed interview with ICE. *Cf.* Joshua Goodman & Tim Sullivan, *Migrants Thought They Were in Court for a Routine Hearing. Instead, It Was a Deportation Trap*, Associated Press, Nov. 19, 2025, https://tinyurl.com/bda8pfpy (documenting recent phenomenon of ICE agents "arrest[ing] immigrants in courthouse hallways" following routine hearings); Maanvi Singh & Will Craft, *As Deportations Ramp Up, Immigrants Increasingly Fear ICE Check-Ins: 'All Bets Are Off,'* The Guardian, Apr. 6, 2025, https://tinyurl.com/4yeptj8b (reporting on ICE's arrests of immigrants

when they show up for routine check-ins). Using subpoenas for witness testimony as a smokescreen for arrest and detention would plainly be improper. *See United States v. Powell*, 379 U.S. 48, 58 (1964) (explaining that a subpoena is improper if it is deployed for "collateral" purposes); *cf. Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972) (observing that it is "improper" to use a grand jury subpoena to "prepar[e] an already pending indictment for trial" (citation omitted)).

## II.    Compelling enforcement of the administrative subpoenas would violate the tenth amendment.

Separate and apart from the foregoing problems with the administrative subpoenas at issue, there is an independent constitutional problem here: Compelling enforcement of the subpoenas would violate the anti-commandeering principle enshrined in the Tenth Amendment.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The U.S. Supreme Court has interpreted this language to establish a broad anti-commandeering principle: "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935; *see also New York v. United States*, 505 U.S. 144, 161 (1992) (similar). This anti-commandeering principle serves as "one of the Constitution's structural protections of liberty," because "[t]he power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States." *Printz*, 521 U.S. at 921-22. The U.S. Supreme Court has further observed that the government, by commandeering states and their officers to implement federal policy, could require states to "absorb the financial burden of implementing a federal regulatory program" and "tak[e] the blame for its … defects."

*Id.* at 930; *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473-74 (2018) (summarizing key justifications for the anti-commandeering principle). Applying these principles, courts have widely acknowledged that "the Tenth Amendment prevents Congress from compelling … municipalities to cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018); *see also United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (explaining that "the anticommandeering rule" entails "the right … to refrain from assisting with federal efforts" to enforce immigration law).

***Production of witnesses***. Even if § 1225(d)(4) purported to authorize subpoenas directing OPSO to convey witnesses into ICE's custody for interviews, and even if ICE could properly use such interviews as a pretext for arrest and detention, that scheme would amount to an end-run around the limitations on ICE detainers and therefore could not survive Tenth Amendment scrutiny. As discussed above (at pg. 3), ICE detainers issued under 8 C.F.R. § 287.7(d) are *voluntary*. Courts across the country have explained that ICE detainers would violate the Tenth Amendment's anti-commandeering principle if they were mandatory. *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) ("[A] conclusion that a detainer issued by a federal agency is an order that state and local agencies are compelled to follow[] is inconsistent with the anti-commandeering principle of the Tenth Amendment."); *Lopez-Lopez v. Cnty. of Allegan*, 321 F. Supp. 3d 794, 797 n.2 (W.D. Mich. 2018) ("If detainers were mandatory, they would likely be struck down on anti-commandeering, Tenth Amendment grounds." (citing *Galarza*)); *cf. City of El Cenizo*, 890 F.3d at 180-81 (Fifth Circuit observing, with respect to federal statutes establishing various *voluntary* mechanisms for local governments to cooperate with federal immigration enforcement: "Congress did not choose to make these laws voluntary; it could not have made them mandatory.").

Here, OPSO believes that ICE is using its subpoena power in an attempt to *mandate* that state inmates be turned over to federal immigration officials for arrest in a way that 8 C.F.R. § 287.7(d) does not authorize—and, under the Tenth Amendment, could not authorize. At minimum, the serious Tenth Amendment problems posed by such a scenario militates against a construction of 8 U.S.C. § 1225(d)(4) authorizing the novel use of witness-production subpoenas at issue here. *See supra* 5-8.

**Immigration "roster" creation and maintenance**. Another category of subpoena relevant here requires OPSO to create and maintain a "[r]oster" or "list" of "all inmates in [its] custody who have failed to provide verifiable identity documents that correspond with lawful presence in the United States." *E.g.*, R. Doc. 1-2 at 60. ICE has described the purpose of this subpoena as "ascertain[ing] the identities of potential aliens in [OPSO's] custody who have not yet been encountered by immigration officials." Acuna Decl. ¶ 76. And as Mr. Acuna has candidly admitted, ICE has "issued serial subpoena requests to OPSO for this information because OPSO's inmates lists would likely change day-to-day, and week-to-week." *Id.* ¶ 85. In essence, then, ICE seeks to "[]press [OPSO] into its service—and at no cost to itself—"as an ongoing support team, creating and continually or indefinitely updating a brand-new database of immigrant detainees for ICE's use. *Printz*, 521 U.S. at 922. Even if a subpoena could validly direct the *creation* of this kind of database (which it cannot, *see supra* 8-10), this is precisely the kind of conscripted service the anti-commandeering principle forbids. Indeed, the U.S. Supreme Court has emphasized that "requiring state officers to perform" even "discrete, ministerial tasks" in service of a federal regulatory program runs afoul of the Tenth Amendment. *Printz*, 521 U.S. at 929. And this is far from a ministerial task: This is precisely the kind of ongoing cooperation with federal regulatory

14

enforcement at issue in *Printz*. *See id*. at 902-04 (describing requirement in the Brady Act that state law enforcement agencies perform background checks).

 ***Other documentary requests***. The document-production subpoenas at issue here also run afoul of the Tenth Amendment. Those subpoenas demand that OPSO turn over copious information about the subject individuals. *E.g.*, R. Doc. 1-2 at 36; *supra* 2 (discussing subpoena language). This expansive request essentially outsources immigration investigation to state and local governments. ICE urges that this is necessary because OPSO has unique access to certain categories of information relevant to immigration enforcement, like current address information, criminal history, and identification documents. *See, e.g.*, Acuna Decl. ¶¶ 17-20. But the fact that state and local governments might have unique access to relevant information does not justify commandeering their resources, or *Printz* would have come out the other way. After all, the entire reason Congress tried to commandeer state law enforcement agencies to run background checks in *Printz* was because there was no federal background-check system at the time. 521 U.S. at 902-03. Moreover, the requirement in *Printz* that local law enforcement officers "research [a potential gun purchaser's criminal history] in whatever State and local recordkeeping systems are available," *id*. at 903, is similar to the subpoena requirement that OPSO review all of its records for information about an individual's criminal history (as in *Printz* itself) in addition to other information. Indeed, the ICE subpoenas here arguably impose more invasive obligations on OPSO than the requirement to run a simple background check in *Printz*, because the subpoenas to OPSO request not just the kind of criminal history information at issue in *Printz* but a wide array of other information, too.

 The decision in *U.S. Immigration & Customs Enforcement v. Gomez*, 445 F. Supp. 3d 1213 (D. Colo. 2020), *see* R. Doc. 1-1 at 8, 11, 14, is not to the contrary. There, the court held that three

subpoenas for discrete categories of documents did not violate the Tenth Amendment. 445 F. Supp. 3d at 1214, 1217. But *Gomez* expressly acknowledged that "there might be some point at which requiring ongoing cooperation" with federal immigration enforcement through subpoenas "could constitute 'commandeering'" in violation of the Tenth Amendment. *Id.* at 1217. And indeed, since *Gomez* was decided, ICE subpoenas have now "become a regular occurrence" in the way *Gomez* contemplated could change the commandeering calculus. *Id.* As recently as 2020, when *Gomez* was decided, the "use of immigration subpoenas against state and local enforcement … was highly unusual." Lindsay Nash, *The Immigration Subpoena Power*, 125 Colum. L. Rev. 1, 36 (2025). But "recent years" have seen "an expansion of the federal government's use of immigration subpoenas to compel information from states and localities." *Id.* at 41. And ICE's use of subpoenas "is particularly pronounced in areas with sanctuary jurisdictions." *Id.* Indeed, ICE often begins issuing subpoenas after jurisdictions adopt sanctuary policies. *See id.* at 42-43 (discussing examples). For example, here, ICE only began issuing subpoenas after Louisiana's efforts to terminate the OPSO consent decree stalled. *See generally Cacho* R. Docs. 110-156. Viewed in this context, ICE appears to be "us[ing] the immigration subpoena regime to make precisely the type of enforcement demands that *Printz* forbids." Nash, 125 Colum. L. Rev. at 70. Stated otherwise, here, unlike in *Gomez*, what ICE is seeking to do is "foist[] a mandatory, ongoing disclosure program onto [OPSO]" by issuing a large volume of subpoenas on jurisdictions that have adopted policies with respect to immigration cooperation that the federal government disfavors. 445 F. Supp. 3d at 1217.

### III. Compliance with the subpoenas is constrained by the *Cacho* consent decree.

The petition does not dispute that OPSO cannot comply with the subpoenas if such compliance would conflict with OPSO's obligations under the court-ordered *Cacho* consent decree. R. Doc. 1-1 at 14-15; *cf. Porter v. Becnel*, No. 15-cv-69, 2016 WL 1729549, at *3 (M.D. La. Jan. 15, 2016) (recognizing that court orders can "foreclose" later compliance with a

subpoena). The petition simply argues that the consent decree does not in fact bar compliance with the ICE subpoenas at issue. That is wrong.

As a threshold matter, subsequent developments have overtaken the petition's argument that the consent decree is stayed under the PLRA and therefore has no effect on OPSO's compliance with the administrative subpoenas here. Judge van Meerveld recently ruled in the *Cacho* litigation that the PLRA's restrictions on prospective relief do not apply to the consent decree in that action. *See* Order and Reasons at 6-12, 18, *Cacho v. Gusman*, No. 11-cv-225 (E.D. La. Feb. 18, 2026), ECF No. 178. As a result, the consent decree is not currently stayed by operation of 18 U.S.C. § 3626(e), but instead remains in effect. *See id*.

The consent decree, in turn, limits OPSO's ability to comply with the administrative subpoenas. Most notably, although the consent decree bars OPSO from "initiat[ing] any immigration status investigation into individuals in OPSO's custody," R. Doc. 1-2 at 76, the subpoenas requiring OPSO to create and maintain a list or roster of detainees without documented legal status, *e.g.*, Acuna Decl. ¶¶ 75-86; R. Doc. 1-2 at 54-63, requires such an investigation. Indeed, ICE itself characterizes these subpoenas as "asking OPSO to identify individuals who may be aliens." Acuna Decl. ¶ 78. Because creating the roster requested by ICE would require the kind of immigration-status investigation prohibited by the consent decree, OPSO cannot comply with those subpoenas.

## CONCLUSION

For the foregoing reasons, the Court should deny the petition for judicial enforcement of administrative subpoenas.

**RESPECTFULLY SUBMITTED,**
**ORLEANS PARISH SHERIFF'S OFFICE**

*/s/ Tracey J. Comeaux*

_____
**TRACEY J. COMEAUX** (LSBA No. 38700)
Chief Legal Officer
Comeauxt@opso.us
**JOHN S. WILLIAMS** (LSBA No. 32270)
Chief of Staff and Legal Counsel
Williamsjo@opso.us
2800 Perdido Street
New Orleans, LA 70119
(504) 822-8000 office
(504) 202-9454 facsimile
COUNSEL FOR SHERIFF HUTSON
-PUBLIC ENTITY/FEE EXEMPT-
(See La. R.S. 13:4521 & 13:5112)