UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

SUSAN HUTSON, in her official capacity as
ORLEANS PARISH CRIMINAL SHERIFF

MISCELLANEOUS CASE

NO. 26-0113

SECTION: "O" (3)

**MEMORANDUM OF *AMICUS CURIAE*
KATHRYN O. GREENBERG IMMIGRATION JUSTICE CLINIC IN OPPOSITION TO
PETITION TO ENFORCE ADMINISTRATIVE SUBPOENA**

The Kathryn O. Greenberg Immigration Justice Clinic ("Immigration Justice Clinic")
respectfully files this *Amicus Curiae* Memorandum in opposition to the United States' ("federal
government") Petition to Enforce Administrative Subpoenas ("Pet."). Dkt. 1. The Immigration
Justice Clinic has done substantial research into and public education about Immigration and
Customs Enforcement ("ICE") administrative subpoenas. That work is led by Professor Lindsay
Nash, a leading academic authority on these subpoenas.

The subpoenas at issue in this case are unprecedented and unlawful. The federal
government argues that 8 U.S.C. § 1225(d)(4) entitles it to much more than documents and
testimony from the recipient. Specifically, the subpoenas demand that OPSO hand over almost
every conceivable document in its possession concerning nine individuals that ICE believes it
can deport. In addition, ICE's subpoenas demand that OPSO regularly conduct new analyses and
create new lists of suspected noncitizens in OPSO custody. Most alarmingly, ICE's subpoenas
demand that OPSO "produce" six human beings to the ICE Field Office—i.e., take custody of
these people for a new purpose and transfer them to ICE— at which point they would supposedly
testify in ICE investigations concerning their own right to be in the United States.

Congress never intended to authorize immigration authorities to use the subpoena power to compel local law enforcement to conduct arrests on its behalf, to defy a court order, or to participate in its federal immigration enforcement program. The history of ICE's subpoena power and ICE's statements in this case demonstrate that ICE issued these subpoenas for the improper purpose of targeting OPSO as a so-called "sanctuary" jurisdiction. *Amicus* respectfully submits the following memorandum in opposition to Petitioner's motion to enforce.

**BACKGROUND**

In 2025, the Immigration Justice Clinic's co-director, Lindsay Nash, published a law review article detailing ICE's expanding use of administrative subpoenas. *See* Lindsay Nash, *The Immigration Subpoena Power*, 125 Colum. L. Rev. 1 (2025). Based on an exhaustive survey of the relevant scholarship, the history of the Immigration and Nationality Act's ("INA") administrative subpoena statute, and review of internal ICE policies and data, Professor Nash found that "[s]ince late 2019, ICE has issued many immigration subpoenas to state and local law enforcement, first driven by a desire to retaliate against sanctuary jurisdictions and then to recreate" the levels of local law enforcement cooperation that ICE enjoyed before states and localities began passing legislation limiting that cooperation. *Id*. at 61. The article also uncovered the use of subpoenas as part of "an initiative focused on generating negative press and outrage for sanctuary jurisdictions." *Id*. at 61–62. ICE "Field offices would 'nominate' sanctuary jurisdictions to target with immigration subpoenas, and, once headquarters leadership selected sanctuary jurisdiction targets, headquarters leadership directed field office leadership to identify set numbers of cases with facts that would play well in the media and courts." *Id*. at 62. Given these motivations and the substance of the demands made via subpoena, Professor Nash concluded that ICE's recent subpoenas to states and localities that declined to participate in

federal immigration enforcement "impose[] far more burdensome demands, requires more active investigation assistance, and intentionally thwarts state and local policies of declining to participate in federal enforcement." *Id*. at 71.[1]

In 2013, this Court entered a consent decree in *Cacho v. Gusman*, settling claims that OPSO unconstitutionally detained the plaintiffs pursuant to ICE detainers for months past their release dates. No. 11-225, 2026 WL 456587, at *1-2 (E.D. La. Feb. 18, 2026). The *Cacho* consent decree requires that OPSO "decline all voluntary ICE detainer requests" unless the person is charged with certain crimes. *Id*. A detainer is a voluntary request for a law enforcement agency to hold a noncitizen past their release date so that ICE may arrest them. *See* 8 C.F.R. § 287.7. The federal government twice filed briefs in *Cacho* seeking an expeditious end to the decree. *See* Statement of Interests of the United States, *Cacho*, Dkt. 134 (E.D. La Apr 23, 2025); Supplemental Statement of Interests of the United States, *Cacho*, Dkt. 146 (E.D. La Jul. 23, 2025). Nevertheless, the consent decree remains in effect. *Cacho*, 2026 WL 456587, at *10.

Between October 2025 and January 2026, ICE demanded that OPSO produce six noncitizens for in-person interviews at the ICE Field Office "as early as practicable," documents concerning those noncitizens and three others, and lists of all suspected noncitizens in OPSO custody. *See* Declaration of Brian S. Acuna ("Acuna Decl."), Dkt. 1-2 ¶¶ 14, 20, 75–85. ICE makes no promises to remand the individuals back to OPSO custody after they are "produced."

---

[1] The federal government continues to target local entities for perceived insufficient cooperation with ICE. *See e.g. Read the complete transcript of Trump's 2026 State of the Union*, the Associated Press, updated Feb. 25, 2026, https://apnews.com/article/donald-trump-transcript-state-of-union-2026-c13e2a07df999b464b733f4a6e84dbd4 ("That is why I'm also asking you to end deadly sanctuary cities that protect the criminals and enact serious penalties for public officials who block the removal of criminal aliens. In many cases, drug lords, murderers all over our country. They're blocking the removal of these people out of our country. And you should be ashamed of yourself."); *DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law*, DHS, May 29, 2025, https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

Rather, ICE previously issued detainers for all nine noncitizens, seeking to arrest them. *Id*. ¶ 14. Meanwhile, ICE subpoenas must be issued on Form I-138. *See* 8 C.F.R. § 287.4(b). ICE's demands for OPSO to transfer six individuals to its custody were made on a form other than Form I-138.

On January 8, 2026, ICE Deputy Field Office Director ("DFOD") Brian Acuna sent an email titled "ICE Subpoenas" to OPSO. In it, DFOD Acuna wrote, "I once again renew my advice to the OPSO that the Sheriff or her delegate withdraw your 2013 sanctuary policy and come into full compliance with ICE access to your facility…and honor each and every detainer that ICE files and that ICE has already filed." *Id*. at 72. DFOD Acuna also attempted to circumvent the binding *Cacho* consent decree, stating "[i]t makes no sense going into research and case law, when the settlement language attached clearly states your policy should have remained in effect, only until…May 2024." *Id*. at 73. He then claimed that one part of the *Cacho* policy "violates federal immigration law." *Id*. Finally, DFOD Acuna gave OPSO a path to its salvation: "attached information on all three ICE 287(g) partnerships available to you as of today. The Sheriff has only to make an application at our website." *Id*.

Ten days later, the federal government petitioned this Court to enforce the subpoenas against OPSO's head, Susan Hutson. *See* Pet. In his declaration in support of the petition, DFOD Acuna stated that ICE issued the subpoenas "[b]ased upon OPSO's prior failures to honor ICE detainers." Acuna Decl. ¶14.

## ARGUMENT

I. **Section 1225(d)(4) Does Not Authorize the Onerous and Wide-ranging Subpoenas ICE Seeks to Enforce**

In relevant part, the subpoena statute states that:

> any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service.

8 U.S.C. § 1225(d)(4)(A). The statute contains no language indicating that it empowers immigration officers to compel third parties to produce persons in their custody. Nor does the statute state that it ICE can force the recipient to make ongoing and broad document productions. As such, courts should look to canons of statutory interpretation to determine the statute's reach. These canons indicate that ICE's demands in this case fall outside of § 1225(d)(4)'s ambit.

### A. The Canon of Constitutional Avoidance Counsels Against Interpreting § 1225(d)(4) to Empower ICE to Commander OPSO

Where a statute raises "a serious doubt" as to its constitutionality, Courts should "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62 (1932). Here, ICE's expansive interpretation of its subpoena power would allow it to impose not only "ministerial reporting requirements," but robust and continuing production of documents, lists, and even people. This would raise serious doubts as to whether § 1225(d)(4) violates the Tenth Amendment.

Under the Tenth Amendment, "[i]t is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997). As such, the Tenth Amendment prohibits the federal government from commanding "the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id*. at 935. The Court left open the question of whether "purely ministerial reporting requirements" violate the Tenth Amendment's anti-commandeering principle. *Id.* at 936 (O'Connor, J., concurring). Courts

have since found that state and local policies limiting communication with DHS must be permitted to preserve state sovereignty. *See Chicago v. Sessions*, 321 F. Supp. 3d 855, 866-73 (N.D. Ill. 2018), *aff'd sub nom. Chicago v. Barr*, 961 F.3d 882, 870 (7th Cir. 2020); *United States v. California,* 921 F.3d 865, 891 (9th Cir. 2019).

Only one court has passed upon the issue of whether § 1225(d)(4) unlawfully commandeers local agencies. *See Immigr. & Customs Enf't v. Gomez*, 445 F. Supp. 3d 1213, 1217 (D. Colo. 2020). In that case, the Court found that though a "sterile request for specific identifying information" does not violate the Tenth Amendment, "there might be some point at which requiring ongoing cooperation could constitute 'commandeering.'" *Id*.

Here, ICE's requests of OPSO are burdensome, require ongoing cooperation, and likely constitute commandeering. Allowing ICE to command OPSO to deliver ICE's suspects to ICE's office on a proverbial silver platter unlawfully forces OPSO to "administer and enforce" federal immigration law. *Printz*, 521 U.S. at 935. Unlike in *Gomez*, where ICE sought the "criminal file" of three noncitizens and the court believed that the subpoenas were a "unique process in the history of ICE," *id*. at 1214-15, 1217, ICE here sought "biographical information, home address, information obtained from identification documents (such as a driver's license numbers and state, foreign identification document card numbers and country, passport numbers and country), copies of these identification documents, bond information to include obligor name and address, and emergency contact information" and "the arrest report, booking sheet, booking photo, probable cause statements, release agreements, and associated bond or surety documents." Acuna Decl. ¶ 20. And the requests did not stop there. ICE requested regular production of "lists for inmates in OPSO custody who have failed to provide verifiable identify [sic] documents that correspond with lawful presence in the United States." *Id*. ¶ 75. In the span of five weeks, ICE

issued five such requests. *Id*. ¶¶ 80–84. In his email to OPSO, DFOD Acuna indicated that ICE would continue to issue these subpoenas: "If you have new OPSO inmates booked after your response, when ICE files new subpoenas for the lists you need to respond with information on the new OPSO inmates meeting these categories." *Id*. at 73.

ICE's custody transfer "subpoenas" are even more demanding:

> The witness must be brought to the New Orleans Office of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations…as early as practicable (at least 48 hours, if possible) before the individual is released from your custody. The witness must be brought between the hours of 8 a.m. and 4 p.m., Central Standard Time. <u>You must provide at least 48 hours' notice before providing the witness.</u>

*Id*. at 18 (emphasis in original). The subpoenas also direct that in lieu of transporting the six persons to the ICE Office, OPSO "may arrange for an immigration officer to receive the witness directly from the facility where the witness will be released from your custody" with forty-eight hours' notice. *Id*. These resource-intensive and continuing obligations are of the type that the *Gomez* court stated would be constitutionally suspect. *Gomez,* 445 F. Supp. 3d at 1217. The demands hijack OPSO staff and resources in service of the federal government's immigration priorities. And enforcing the subpoenas would usurp OPSO's sovereign prerogative to focus its resources towards enforcing Louisiana law. As such, interpreting § 1225(d)(4) to force compliance with such ongoing and numerous requests would raise serious Tenth Amendment concerns.

### B. Subsequent Amendment to the INA Demonstrates that § 1225(d)(4) Does Not Apply to Requests to Produce a Person.

"When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS.*, 514 U.S. 386, 397 (1995). As such, courts should not interpret statutes to render subsequent amendments superfluous. *See Sec. & Exch. Comm'n v.*

*Hallam,* 42 F.4th 316, 337 (5th Cir. 2022).[2] Here, a subsequent amendment to the INA demonstrates that the original subpoena power was limited in scope and was not intended to mandate ongoing cooperation between local, state, and federal entities.

Section 1225(d)(4)'s subpoena power has existed, in essentially its current form since 1952. *Compare* INA of 1952, June 27, 1952, ch. 477, §235, 66 Stat. 163, 199 *with* 8 U.S.C. § 1225(d)(4)(A) (2006). But it was not until 1996 that Congress enacted 8 U.S.C. § 1357(g), a provision allowing for cooperation agreements (called 287(g) agreements referencing the INA section authorizing them) between local governments and federal immigration agencies. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, PL 104–208, 110 Stat 3009. The latter statute governs the "[p]erformance of immigration officer functions" by state and local employees and authorizes cooperative agreements between ICE and localities that permit localities to perform certain immigration enforcement functions. 8 U.S.C. § 1357(g). Importantly, Congress made clear that the statute shall not "be construed to *require* an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State…to communicate with the Attorney General regarding the immigration status of any individual" or "otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A)-(B) (*emphasis added*).

Thus, in enacting this subsequent provision addressing state and local interactions with the immigration enforcement agency, Congress made clear that the INA permits assistance from *willing* states and localities (under federal control). It does not require information, investigation, or other enforcement assistance from *all* states or localities. The government's current urged application of § 1225(d)(4) would render the 1996 amendment superfluous. If Congress had

---

[2] Relatedly, "it is a cardinal rule of statutory interpretation that we are to consider the whole act, reading each section in light of the others." *Smith v. City of Jackson, Miss*., 351 F.3d 183, 190 (5th Cir. 2003).

believed that, simply by signing a subpoena form, immigration enforcement agencies could force local actors to cooperate in the apprehension and detention of noncitizens, there would have been little point in enacting § 1357(g). If § 1225(d)(4) could compel mandatory and resource-intensive cooperation, the subsequent amendment would have been unnecessary and contradictory.

### C. The Presumption Against Change in Common Law Demonstrates that § 1225(d)(4) Does Not Apply to Requests to Produce a Person

A statute should be construed to alter the existing common law only when it clearly evinces its intent to do so. *See In re Black Elk Energy Offshore Operations, LLC*, 114 F.4th 343, 353 (5th Cir. 2024). At common law, the subpoena power did not extend to demands for jailers to produce the persons they detained. In general, "witnesses who are confined in jail" were "beyond the reach of the ordinary subpoena." *Neufield v. United States*, 118 F.2d 375, 385 (D.C. Cir. 1941). This is because "[i]f the desired witness is confined in jail (or in a state hospital for the criminal insane) a subpoena would be of no avail, since he could not obey it and his custodian would still lack authority to bring him." *In re Thaw*, 166 F. 71, 75 (3d Cir. 1908) (quoting John Henry Wigmore, *A Treatise on the System of Evidence in Trials at Common Law* Vol. 4, Sec. 2199 (1st ed. 1904)). Instead, the proper vehicle to force a custodian to produce a witness was, and is today,[3] to petition to a court for a writ of habeas corpus ad testificandum. *Id*.

At common law, writs of habeas corpus ad testificandum did not force custodians to produce detained persons in response to administrative subpoenas. Neither the 1917 version of the statute nor any subsequent versions contain any mention of the creation of any writ of habeas corpus ad testificandum equivalent for immigration subpoenas. *See* Act of Feb. 5, 1917, ch. 29, §

---

[3] *See Ramanathan v. Fin. All. Ltd*, No. 18-CV-25398, 2021 WL 3742766, at *2 (S.D. Fla. July 16, 2021), *report and recommendation adopted*, No. 18-25398-CIV, 2021 WL 3742072 (S.D. Fla. Aug. 24, 2021) (characterizing prisoners as "beyond the reach of an ordinary subpoena.").

16, 39 Stat. 874, 886; §235, 66 Stat. at 199. Because the statues contain no sign of clear Congressional intent to create such a mechanism at odds with the common law, the common law understanding should prevail— agency subpoena power does not extend to requests for jailers to produce persons in their custody.[4]

### D. Section 1225(d)(4)'s Legislative History Confirms that it Does Not Apply to Requests to Produce a Person

The legislative history further evinces the limited scope of § 1225(d)(4). In 1917, Congress created the immigration subpoena to aid in the removal of Asian immigrants from the United States. *See* S. Rep. No. 64-352, at 12 (1916). Congress expanded the subpoena power in 1952 to assist immigration officers "in ferreting out concealments and frauds connected with naturalization proceedings" so as to "put the government in a position to deal more effectively with subversives." *Application of Barnes*, 219 F.2d 137, 145 (2d Cir. 1955). The Senate Report on the 1952 passage states that "[w]hile the Nationality Act provides for subpena [sic] of witnesses at a preliminary hearing and for calling of witnesses in any naturalization proceedings in court, specific provision is not made for subpenaing [sic] the petitioner. The subcommittee feels that the proposed bill should contain the requirement that the petitioner be required to attend hearings and is so recommending." S. Rep. No. 81-1515, at 739 (1950).

None of this legislative history indicates any desire from Congress to allow immigration authorities to use its subpoena power to force local law enforcement to turn over noncitizens in their custody. Nor do any of the reports from the enactment indicate that Congress sought to

---

[4] The Supreme Court also requires an "unmistakably clear" statement in the statutory text for federal legislation to be considered binding on states. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). As such, "federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004). As described in detail in OPSO's brief and in subsection A, *supra*, the federal government's reading of § 1225(d)(4) implicates significant federalism concerns.

empower immigration authorities to use the subpoenas to arrest and detain noncitizens suspected of violating immigration laws.

### E. Longstanding Administrative Practice Demonstrates that § 1225(d)(4) Does Not Apply to Requests to Produce a Person

A "longstanding 'practice of the government'…can inform [a court's] determination of 'what the law is.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)). Conversely, when "an agency claims to discover in a long-extant statute an unheralded power ... [courts] greet its announcement with a measure of skepticism." *Util. Air Regulatory Grp. v. EPA*, 574 U.S. 302, 324 (2014).

The Department of Homeland Security's ("DHS") own regulations demonstrate its understanding that its powers under § 1225(d)(4) are limited. First, its subpoena regulation requires that "subpoenas shall be issued on Form I-138." 8 C.F.R. § 287.4(b). Form I-138 contains two check boxes, one ordering testimony of the named recipient and the other requesting the production of documents. *See* Acuna Decl. at 21. The text next to the testimony check box commands the recipient to "APPEAR… at the place, date, and time specified, to testify and give information relating to the matter indicated in Block 2." *Id*. Block 2 contains spaces for "title of proceeding" and "File number, if applicable." *Id*.[5] This is consistent with the regulation, which requires that the subpoena "shall command the person or entity to which it is addressed to attend and to give testimony at a time or place specified." 8 C.F.R. § 287.4(b)(1). Finally, the regulation empowers ICE to seek judicial enforcement of a subpoena if "a witness neglects or refuses to appear and testify." 8 C.F.R. § 287.4(d).

---

[5] In the instant case, ICE issued subpoenas for document production using Form I-138, but subpoenas for testimony using a different form. *See* Acuna Decl. at 18. The fact that ICE created an entirely new, unauthorized form to demand that OPSO transport transfer individuals to the ICE Field Office also reflects how significantly this request departs from its longstanding interpretation of the scope of its subpoena power.

These provisions indicate the government's understanding that any request for testimony should be directed at the witness themselves rather than a third-party. They also show that testimony must be related to an actual ongoing proceeding and specify a time certain. Finally, the judicial enforcement subsection's *mens rea* requirement further demonstrates the government's comprehension that a subpoena's commands are personal—they cannot command a third party custodian to produce a detained person.

Likewise, DHS's detainer regulation describes a detainer as "a request that [a nonfederal] agency advise the Department, prior to release… in order for the Department to arrange to assume custody." 8 C.F.R. § 287.7(a). This provision would have been unnecessary if ICE could obtain custody of an individual simply issuing a subpoena to their custodian. This regulation confirms DHS' practice of treating detainers, not subpoenas, as the means by which it arrests noncitizens in local law enforcement agencies.

To be clear, the federal government now claims the power to force local law enforcement to take people from their custody and transfer them to ICE custody. The "subpoenas" it seeks to enforce in this case demand this transfer "as soon as practicable." Acuna Decl. at 18. Notably, the subpoenas also allow OPSO to "arrange for an immigration officer to receive the witness directly from the facility where the witness will be released from your custody." *Id*. They do not contain any provision for the individual's post-interview "release" or return to OPSO custody. The powers ICE now claims exceed even those of DHS' detainer regulation, which contemplates custody transfer around the date that local law enforcement agencies would otherwise release the individual. *See* 8 C.F.R. § 287.7(a), (d). Granting ICE this power would represent a radical departure for decades of administrative practice.

**II.  ICE's Recent Use of Subpoenas Specifically Targets "Sanctuary" Jurisdictions and Demonstrates an Improper Purpose**

Courts should not enforce the subpoenas if they "had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell,* 379 U.S. 48, 58 (1964). ICE's recent expansion of its subpoena power serves to punish localities that decline to use their resources for federal immigration enforcement. As in many other jurisdictions, ICE here is motivated by the illegitimate purpose of pressuring OPSO to prematurely[6] reverse its lawfully made policy determination that the *Cacho* consent decree was the best way to prevent the Constitutional violations at issue in that case.

Since 2020, ICE leadership launched an internal campaign to expand the use of immigration subpoenas to coerce state and local law enforcement.  In response to a wave of jurisdictions that have chosen to extricate themselves from serving as federal immigration enforcement "force multipliers," ICE has used "immigration subpoenas to force state and local actors into that role." 125 Colum. L. Rev. at 43. Data produced by the agency indicate that the number of field offices that have issued these subpoenas to state and local law enforcement more than doubled after 2019, meaning that a practice described as unprecedented in 2020—and that was then far more limited in scope— spread across much of the nation. *Id*. at 98 (analyzing data from more than 3,000 immigration subpoenas issued between 2007 and 2023). While subpoenas issued before 2017 tended to be narrower and targeted, often seeking a single, defined document, many subpoenas issued in recent years have ballooned in scope and the burden they impose on

---

[6] On January 8, 2026, DFOD Acuna admonished OPSO, "[i]t makes no sense going into research and case law" because of ICE's interpretation that the *Cacho* consent decree self-terminated in May of 2024. Acuna Decl. at 73. On January 16, 2026, the federal government argued in this case that the consent decree was stayed. *See* Pet. ¶ 8. On both dates, as now, the decree remained and remains in effect. *Cacho,* 2026 WL 456587, at *4, 10.

sub-federal officers attempting to respond. *Id.* at 44. ICE has sought to deploy subpoenas to "force recipients to provide a range of objects and actions to assist with immigration enforcement" including to "affirmatively provide notifications—in perpetuity" *Id*. at 53. Such uses are "well beyond…statutory bounds." *Id*.

The data that ICE produced also show that these new tactics have a particular focus: criminal legal system actors in jurisdictions that limit cooperation with ICE. For instance, data produced from the Washington ICE Field Office reveal a dramatic uptick in subpoenas to state and local law enforcement comprised entirely subpoenas issued to a police department in Fairfax County, Virginia; this practice began just as the county adopted a sanctuary policy in 2021.[7] Similarly, for San Diego and Chicago, ICE subpoena logs covering 2020 onwards show those field offices issuing many (for San Diego, hundreds) subpoenas to state and local law enforcement operating under state sanctuary laws. *See* 125 Colum. L. Rev. at 43. Records from other jurisdictions that chose to limit their cooperation with ICE, such as New York City and Connecticut, similarly indicate the use of subpoenas to target law enforcement in those areas. *Id.*

The agency's own records, therefore, paint a clear picture: ICE is using its subpoena power to target sanctuary jurisdictions. As Professor Nash concluded, ICE uses its subpoenas to "intentionally thwart[] state and local policies of declining to participate in federal enforcement" and pressure the jurisdiction to establish a robust cooperative agreement with the agency. *Id*. at 71. ICE's subpoena program often moves in lockstep with its public relations campaigns against noncooperative jurisdictions. *Id*. at 62. So too here. ICE publicly criticized OPSO for releasing one of the subjects of the subpoenas, Jose Fernando Arzu-Osorto, shortly before filing this

---

[7] *See* Fairfax Cnty., Va., Trust Policy 1, 2021, https://www.fairfaxcounty.gov/topics/sites/topics/files/assets/documents/pdf/fairfaxcounty-trust-policy.pdf [https://perma.cc/E5ND-L5WK]

petition. *See* Acuna Decl. at 18.[8] DFOD Acuna and other officials have repeatedly criticized OPSO's adherence to the *Cacho* policy in the media.[9] For example, in February of 2025, DFOD Acuna told CBS News, "[a]ll the other sheriffs are cooperative except for" OPSO.[10] When discussing ICE efforts "to get better cooperation" from OPSO, DFOD Acuna stated, "[w]e're working on it every day. . .This has been an issue here in this area since 2013."[11]

DFOD Brian Acuna's email memorializing a meeting with OPSO all but confirms this understanding. *See* Acuna Decl. at 72. Though the meeting was purportedly held to discuss the subpoenas themselves, three of the four agenda items were about whether or not OPSO would honor detainers and/or establish a more complete 287(g) program for affirmative compliance with ICE. *Id*. Of course, OPSO's detainer policy is governed by the *Cacho* consent decree. *Cacho*, 2026 WL 456587, at *1-2. It represents the culmination of years of negotiation between OPSO and the plaintiffs in that case concerning the optimal solution to resolving allegedly unconstitutional over-detention of people in OPSO custody subject to ICE detainers. *Id*. Parties to such consent decrees are entitled to discretion, subject to judicial approval, in using their best judgment to negotiate the best remedy for Constitutional violations. *See e.g. United States v. Louisiana*, 90 F.R.D. 358, 361–62 (E.D. La. 1981), *aff'd*, 669 F.2d 314 (5th Cir. 1982); *Montana Env't Ctr. v. Montana Dep't of Env't Quality*, No. CV-23-28-BMM, 2025 WL 263462, at *2 (D.

---

[8] *See also DHS Launches Operation Catahoula Crunch in New Orleans Targeting Criminal Illegal Aliens Released From Jail and Back into American Communities*, Dep't of Homeland Sec'y, Dec. 3, 2025, https://www.dhs.gov/news/2025/12/03/dhs-launches-operation-catahoula-crunch-new-orleans-targeting-criminal-illegal.

[9] *See e.g.* Bobbi-Jeanne Misick, *Orleans Sheriff says state has no proof 'sanctuary' jail policy violates law, Louisiana Illuminator*, May 1, 2025, https://lailluminator.com/2025/05/01/orleans-sanctuary-2/; Chris Joseph, *Fox 8 cameras roll as ICE arrests four on Westbank*, Fox 8, Dec. 19, 2024, https://www.fox8live.com/2024/12/19/fox-8-cameras-roll-ice-arrests-four-westbank/; note 7, *supra*.

[10] Kati Weis, *As ICE ramps up immigration sweeps, New Orleans' sanctuary city status could be put to the test*, CBS News, Feb. 8, 2025, https://www.cbsnews.com/news/ice-immigration-sweeps-new-orleans-sanctuary-city-status-put-to-the-test/.

[11] *Id*.

Mont. Jan. 22, 2025), *appeal dismissed sub nom. Montana Env't Info. Ctr. v. Montana Dep't of Env't Quality*, No. 25-1234, 2025 WL 2452467 (9th Cir. July 28, 2025).

DFOD Acuna made ICE's intent to override OPSO's judgment in *Cacho* clear, stating "I once again renew my advice to the OPSO that the Sheriff or her delegate withdraw your 2013 sanctuary policy and come into full compliance with ICE access to your facility… and honor each and every detainer that ICE files and that ICE has already filed." *Id*. He explicitly and erroneously claimed that the *Cacho* decree was no longer in effect and OPSO's detainer policy violated federal law. *Id*. at 73. After "recommending" that OPSO "comply as soon as possible," DFOD Acuna attached "all three ICE 287(g) partnerships available to you as of today" and states the Sheriff "has only to make an application at our website." *Id*. DFOD Acuna concluded, "OPSO honestly will face significant challenges in restoring trust within ICE and the New Orleans local community due to the OPSO's two decades of sanctuary status." *Id*. Just over a week later, the federal government brought the instant action. *See* Pet. In his declaration in support of this petition, DFOD Acuna again made plain ICE's motivation: "Based upon OPSO's prior failures to honor ICE detainers, ERO issued Immigration Enforcement Subpoenas to OPSO during the months of October 2025 through December 2025." *Id*. ¶14.

Since 2020, then, ICE has established a clear pattern of attempting to use subpoenas to bludgeon local law enforcement into compliance with its voluntary detainer program. The instant subpoenas are no exception. This coercive purpose is improper under *Powell*.

## CONCLUSION

The federal government asks this Court to enforce subpoenas requesting unprecedented levels of cooperation from a local law enforcement agency. These requests exceed ICE's power under the INA. In addition, the record indicates that ICE issued these subpoenas for the improper

purpose of coercing OPSO to violate its lawful policy choice to enter into the *Cacho* consent decree to participate in the federal government's enforcement program. This Court should deny the government's petition.

Dated: March 3, 2026

Respectfully submitted,

 /s/ Bridget Pranzatelli
**Bridget Pranzatelli**
Louisiana Bar. No: 41899
NATIONAL IMMIGRATION PROJECT
1763 Columbia Rd. NW,
Suite 175 #896645
Washington, DC 20009
Tel.: (504) 940-4777
bridget@nipnlg.org

**Mary Yanik**
Louisiana Bar No.: 36973
TULANE LAW CLINICS
6329 Feret Street, Suite 130
New Orleans, LA 70118
Tel.: (620) 341-2653 (cell)
(504) 865-5153 (general office)
 myanik@tulane.edu

**Jeremy Jong***
New Jersey Bar No.: 066472014
AL OTRO LADO
634 S Spring St., Suite 908
Los Angeles, CA 90014
(504) 475-6728
jeremy@alotrolado.org

*** Motion to appear pro hac vice forthcoming*