UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CASE NO. 26-113 |
| v. | * | SECT. O(3) |
| SUSAN HUTSON, in her official capacity as ORLEANS PARISH CRIMINAL SHERIFF | * | JUDGE LONG |
| | * | MAG. JUDGE DOSSIER |

UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF
PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS

I.   Introduction and summary of the argument

**MAY IT PLEASE THE COURT**: The Orleans Parish Sheriff's Office's (OPSO) opposition memo, Rec. Doc. 19, makes no attempt to dispute the accuracy of the testimonial declaration of the ICE Deputy Field Office Director in support of the United States' petition, *see* Rec. Doc. 15 (joint stipulation), offering instead a grab-bag of assorted legal arguments ranging from the Bill of Rights (*circa* 1791) to the absence of a marking on the bottom of a form (I-138). Each is addressed below, but the fundamental issue before the Court remains unchanged: The United States has carried its minimal *Morton Salt* requirements for judicial enforcement of the administrative subpoenas, and presently affirms its willingness to cure any complained-of technical defects and reduce any burdens associated with the OPSO's compliance. For these reasons, the Court should grant the United States' petition.

II.   Argument

The United States addresses the OPSO's opposition arguments from the highest level of generality (constitutionality) to the granular (the *Cacho* consent decree).

   a.   **ICE is not commandeering the OPSO in violation of the Tenth Amendment.**

Relying principally on *Printz v. United States*, 521 U.S. 898 (1997), the OPSO argues that the ICE subpoenas "violate the anti-commandeering principle enshrined in the Tenth

Page **1** of **11**

Amendment." Rec. Doc. 19 at p. 12. But in *Printz*, the question was whether the federal government could "compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz* at 925. The administrative subpoenas here do no such thing. Instead, they "require only the provision of information to the Federal Government," and not "forced participation of the States' executive in the actual administration of a federal program," which was the issue in *Printz*. *Id*. at 918.

As the OPSO concedes, Rec. Doc. 19 at p. 15, this same Tenth Amendment argument was rejected in a similar context as basis to avoid responding to "a sterile request for specific identifying information" in administrative subpoenas. *See United States Immigr. & Customs Enf't v. Gomez*, 445 F. Supp. 3d 1213, 1217 (D. Colo. 2020). In fact, in *Gomez*'s correct view, such requests do not even "come[] close" to triggering "ongoing cooperation [that] could constitute 'commandeering[.]' " *Id*. Nor do the subpoenas here "foist[] a mandatory, ongoing disclosure program onto the Sheriff's Department whenever it comes into contact with a particular class of persons." *Id*. To the contrary, the subpoenas here either: 1) specifically name nine aliens in OPSO custody for which identifying information or testimony is sought; or 2) seek a list of custodial inmates who lack identity documents, the disclosure of which is not self-executing, but is triggered upon receipt of the subpoena. Rec. Doc. 1-2 at pp. 4–6 & 13–15.

*Gomez* is hardly an outlier either. Even the OPSO's own cited subpoena critic, Professor Nash, acknowledges that "courts have found that certain federal information demands don't constitute the type of compelled enforcement that the anticommandeering rule prohibits, reasoning that those information demands did not infringe on state sovereignty because they imposed little economic or political burden on subfederal governments' gathering of that information anyway."

Lindsay Nash, *The Immigration Subpoena Power*, 125 COLUM. L. REV. 1, 68–69 & n.358 (2025).[1]

### b. The administrative subpoenas comply with the authorizing statute.

The OPSO also argues that ICE lacks statutory authority "to request the particular forms of evidence sought in the subpoenas," justifying non-compliance. Rec. Doc. 19 at p. 5. But the OPSO wisely does not mount a facial challenge to ICE's statutory authority to enforce federal immigration laws, including the detention and removal of inadmissible aliens, or ICE's statutory authority to issue administrative subpoenas. *Id*. at pp. 5–10. Instead, the OPSO is making an as-applied challenge to how ICE's statutory subpoena authority was invoked to seek testimony from aliens in OPSO custody in this instance, *id*. at pp. 5–7, the format of the paperwork received, *id*. at pp. 7–8, and whether the subpoenaed inmate rosters exist, or require independent creation. *Id*. at pp. 9–10. Importantly, all these technical objections are readily curable if the OPSO intends to comply with re-issued administrative subpoenas addressing these objections. But it's clear from the OPSO's opposition memorandum that it has no intention of complying absent a court order compelling it to do so. And the court should issue such an order here.

### 1. Witness testimony

The OPSO does not contest that Congress has authorized the United States to "require by subpoena the attendance and testimony of witnesses before immigration officers[.]" Rec. Doc. 19 at p. 5 (quoting 8 U.S.C. § 1225(d)(4)(A)). As the ICE Deputy Field Office Director noted (and the OPSO also doesn't contest): "[T]he aliens themselves are crucial witnesses to active immigration enforcement cases . . . as information about alienage, potential adjustment of status,

---

[1]   Citing, *inter alia*, *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002) (holding that a federal law which merely required states to forward information did not violate the Tenth Amendment); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1295 (M.D. Fla. 2009) (same); *United States v. Brown*, No. 07-485, 2007 WL 4372829, at *6 (S.D.N.Y. Dec. 12, 2007) (same)); *see also United States v. Torres*, 573 F. Supp. 2d 925, 951 (W.D. Tex. 2008) (rejecting argument that SORNA violates the Tenth Amendment).

and relief applications are best obtained from that alien [] through oral communication with ERO officers." Rec. Doc. 1-2 at p. 4, ¶ 16.[2]

Other local jurisdictions in this federal district allow ICE to secure the sworn testimony of alien-witnesses in state detention upon request and without a subpoena. In contrast, the OPSO's circular argument, taken to its logical conclusion, would have the Court hold that the United States has no viable options to secure sworn testimony from detainees in Orleans Parish. In granting power to issue subpoenas for sworn testimony, Congress surely did not intend such an anomalous result. The OPSO's citation of federal cases on a writ of habeas corpus *ad testificandum*, Rec. Doc. 19 at pp. 5–6, are inapplicable, as that remedy would require the pendency of an existing federal action in which to seek the writ and the testimony. *See* 28 U.S.C. § 1651(a) (federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions") & § 2241(c)(5) (federal courts may issue habeas writs to "bring [prisoners] into court to testify"). The OPSO's argument on this point seeks to "engraft judicial limitations upon the administrative process" of § 1225(d)(4)(A), which *Morton Salt* expressly criticized. *United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950). The Supreme Court further confirmed that administrative agencies have "a power of inquisition . . . which is not derived from the judicial function." *Id*. In the absence of a developed body of federal law on the proper procedures to serve administrative subpoenas on witnesses in state custody, the United States followed state law here, as FED. R. CIV. P. 4(e)(1)

---

[2] *See also* 8 U.S.C. § 1225(d)(3) ("[A]ny immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien . . . to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter[.]"); 8 U.S.C. § 1357(a)(1) (granting ICE "power without warrant--to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); Nash, *supra* at 14, n.60 (noting that proposed administrative subpoena power in 1909 "would require witnesses, including applicants for admission, to testify under oath on pain of perjury and contempt").

contemplates.[3]

The OPSO's CFR-based objection about the form of the testimonial subpoenas is similarly infirm. Rec. Doc. 19 at p. 7. Indeed, the objection is not a challenge to ICE's "lawful purpose within the statutory authority of the issuing agency" to enforce federal immigration laws within the context of the governing *Morton Salt* standard. *Winters Ranch P'ship v. Viadero*, 123 F.3d 327, 329 (5th Cir. 1997). In fact, the only immaterial change from the I-138 Form on the testimonial subpoenas is an instruction clarifying that the recipient of service (Box 1 - the OPSO) isn't the witness who will testify (Box 2 – the specified alien in OPSO custody). *Compare* Rec. Doc. 1-2 at p. 18, *with id*. at p. 21.[4]

## 2. Documents

The OPSO objects to the subpoenas for lists of inmates who lack identity documents because "such a list does not already exist" in the OPSO's custody, and it would have to "generate

---

[3]   *See* FED. R. CIV. P. 4(e)(1) ("[A]n individual . . . may be served in a judicial district of the United States by following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."); LA. CODE CIV. PROC. art. 1235.1(A) ("Service is made on a person who is incarcerated in a jail or detention facility through personal service on the warden or his designee for that shift. The warden or his designee shall in turn make personal service on the person incarcerated.").

[4]   To the extent the OPSO's opposition implies that it would have readily complied with I-138 Form subpoenas for custodial-aliens' testimony with an explanatory addendum, cover letter, or alien's name as service recipient in Box 1, the United States will promptly make the necessary adjustments on Form I-138s, and reissue the subpoenas. The OPSO's objection to the timing and location of the witnesses' testimony is similarly curable. Rec. Doc. 19 at pp. 8 & 13–14. The OPSO's *Cacho* policy, which it insists controls its subpoena responses here, *id*. at pp. 16–17, blocks ICE from "conduct[ing] civil immigration status investigations at OPSO or otherwise interview[ing] an inmate before the detainee's first appearance." Rec. Doc. 1-2 at p. 76. Thus, the subpoenas requested that the testimony occur at an ICE office, not the OPSO, no later than 48 hours before the inmate's release, which necessarily would be after the first appearance. Further, if the OPSO brought a detained witness to ICE's office for the testimony "as early as practicable," but while still under a state-court order of incarceration, the inmate would necessarily return to the OPSO's custody when the examination was completed. If, on the other hand, the OPSO intends to comply with the testimonial subpoenas provided the examinations occur on the OPSO's premises, the United States will, again, make the necessary adjustments to the subpoenas regarding the time and place for compliance, and reissue them.

this roster." Rec. Doc. 19 at p. 10. The OPSO is underselling its recordkeeping.

Any member of the public can search an OPSO online database to find a detainee based only on an inmate ID, first name, last name, or booked date. *See* OPSO, *Detainee Search*, https://www.opso.gov/246/Detainee-Search (last visited March 4, 2026). From there, the OPSO will provide any member of the public a wealth of online information about the detainee, including: inmate ID; height; weight; gender; race; age; eye color; hair color; custody-status date; booked date; holding facility; federal-inmate status; and pending charges. *Id*.

While the OPSO may not maintain in a metal file cabinet day-to-day, week-to-week, ink-on-paper rosters of inmates who lack identity documents, the proper inquiry is whether the OPSO has such information on inmates electronically stored (it most likely does),[5] and whether producing it to the United States in an accessible form would constitute an undue burden on the OPSO (it would not). *See* Section III.b.3, *supra*; *cf.* FED. R. CIV. P. 45(d), (e); FED. R. CIV. P. 34(b); 7 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 34.14 (Lexis online ed. 2026) ("[W]hen it appears that the documents may exist or are within the possession, custody, or control of the responding party, that party may be required to do more than simply assert the contrary."); *Multnomah Cnty. Dep't of Cmty. Just., et al.*, No. 25-1784, 2025 WL 3267361, at *3, n.6 (D. Or. Nov. 24, 2025) ("To the extent Respondents object because they do not have specific pieces of information, they should submit declarations with their subpoena responses detailing what information they do control.").

---

5   The OPSO seeks (but doesn't publicly report) social-security numbers and birth states at booking, the absence of which is potential evidence of alienage. *See* Rec. Doc. 1-2 at p. 14, ¶ 77 ("[J]ails or arresting agencies typically ask arrestees to identify themselves, provide identification card(s), and provide basic biographical information, such as a location of birth and social security number."); *see also* 42 U.S.C. § 405(c)(2)(B)(ii) (satisfactory evidence of citizenship or alien status necessary to receive a SSN); 20 C.F.R. § 422.107(d) (SSN applicant may demonstrate U.S. citizenship by providing a U.S. birth certificate).

### 3. ICE will work with the OPSO to reduce the burdens of compliance.

The OPSO next argues that compliance with the administrative subpoenas, as currently written, would be overly burdensome. Rec. Doc. 19 at pp. 10–11. This is the first time the OPSO raised this objection. Rec. Doc. 1-2 at p. 16, ¶ 90. The OPSO should bear the burden to demonstrate to the Court that compliance would constitute an undue burden. *Multnomah*, 2025 WL 3267361, at *2 (internal citation omitted); *id*. at *3 ("Because HSI has established that the subpoenas meet the *Morton Salt Co*. factors, this Court will enforce them unless the Counties show they are unreasonable."); *see also* 9 MOORE'S FEDERAL PRACTICE § 45.32 (noting, in a Rule 45 context, that "[t]he burden to show undue burden rests on the witness who seeks to quash or modify the subpoena"). In the Fifth Circuit, "a subpoena is not unreasonably burdensome unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *United States v. Chevron U.S.A., Inc.*, 186 F.3d 644, 649 (5th Cir. 1999) (citation omitted).

As the United States noted earlier in this memorandum, it will undertake a good-faith dialogue with the OPSO to reduce, if not eliminate, any burdens associated with responding to the administrative subpoenas. Those steps could include arrangements on the time and location of inmate testimony, the frequency of requests for rosters of inmates lacking identification documents, and the manner of producing these rosters and other documents for the nine aliens identified in the administrative subpoenas, and others who may be similarly situated in the future. *See*, *e.g.*, *Gomez*, 445 F. Supp. 3d at 1215 (rejecting argument "that the cost of providing readily available information contained in an arrested person's criminal file will be significant").

### c. The United States issued the subpoenas for a legitimate statutory purpose.

Relying on *United States v. Powell*, 379 U.S. 48 (1964), the OPSO claims that the subpoenas were issued for an improper purpose. *Powell*, however, is distinguishable. And even if it applies, the United States' underlying purpose—immigration enforcement—finds firm

foundation in the statute. Rec. Doc. 1-2 at pp. 1–7.

First off, *Powell* arose in a significantly different context, namely, the authority of the Internal Revenue Service (IRS) to issue summonses (the Internal Revenue Code's equivalent to administrative subpoenas) to taxpayers under 26 U.S.C. § 7602. *Id.* at 49–51. The Supreme Court held that, to be enforceable, the IRS was required to show "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already in the [IRS's] possession, and that the administrative steps required by the Code have been followed." *Id.* at 57–58.

Moreover, in *Powell*, the IRS's "purpose" was significant because the provision of the Internal Revenue Code that empowered the agency to issue the summonses expressly limited the allowable purpose for which they could be used. Under 26 U.S.C. § 7602(d), the IRS may not issue a summons where it has referred a taxpayer to the Justice Department for a criminal investigation. In sharp contrast, 8 U.S.C. § 1225(d)(4) permits the use of administrative subpoenas to obtain information concerning "any matter which is material and relevant to the enforcement of this chapter;" the Supreme Court has recognized that this language "encompasses the full range of subjects covered by the statute," namely, the immigration system. *See United States v. Minker*, 350 U.S. 179, 185 (1956). The *Powell* standards should not apply here. This case is properly evaluated under *Morton Salt*, not *Powell*.

But even if *Powell* applied, the OPSO has not established the absence of good faith. Under the *Powell* good-faith analysis, the agency bears the initial burden to show good faith, but this burden is "slight" or "minimal" and is generally met by the agency submitting a sworn declaration. *Mazurek v. United States*, 271 F.3d 226, 230 (5th Cir. 2001) (internal citations omitted); *accord United States v. Clarke*, 573 U.S. 248, 254 (2014) (a "simple affidavit" is sufficient to meet an

agency's initial good-faith burden). For a party resisting the summons, though, "[n]aked allegations of improper purpose are not enough," *Clarke*, 573 U.S. at 254, and the resisting party who seeks to present evidence of an improper purpose bears a "heavy burden." *Mazurek*, *supra* (quotation marks omitted).

The OPSO's arguments here do not meet that "heavy burden" to show an improper purpose in the subpoenas. The OPSO argues that the testimonial subpoenas are an "end-run around the limitations of ICE detainers," Rec. Doc. 19 at p. 11, but it cannot show that detaining removable aliens is an improper purpose.[6] The Supreme Court has held that a summons is issued in bad faith only if the agency has a prohibited purpose and that prohibited purpose is "the sole objective of the investigation." *Donaldson v. United States*, 400 U.S. 517, 533 (1971); *see also FTC v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980) ("[E]ven if an improper purpose by an agency … is shown, enforcement of the subpoena is called for so long as proper purposes exist as well."). Similarly, in *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310 (1985), the Court held that even where the IRS's "primary but not sole" motivation for issuing a summons was improper, the existence of any proper purpose was sufficient to render the summons valid. *See id.* at 324, n.7. The test, then, is whether the agency has any proper purpose, and as long as the agency has even one proper purpose, a subpoena is issued in "good faith." Here, that test is met. *See* Rec. Doc. 1-2 at pp. 4–6, ¶¶ 16–19; *Gomez*, 445 F. Supp. 3d at 1216 ("Based on . . . ICE's proffer of the nature of its interest in the information, ICE's burden has been met.***There is no improper purpose evidence on this record, such as, for example, the government using the subpoenas as a pretext for some unstated, nefarious, legally inappropriate reason.").

---

[6]     Notably, the OPSO refused detainer requests that satisfied its restrictive *Cacho* policy for two of the identified aliens, Rec. Doc. 1-2 at pp. 8–12, ¶¶ 31 & 60, further illustrating the pretextual nature of its *Cacho* objections here.

### d. Nothing in the *Cacho* policy's current procedural posture or text bars subpoena enforcement here.

Relegated to the final two pages of its 17-page memorandum, the OPSO finally addresses its lone pre-suit objection – namely, its *Cacho* policy and consent decree on ICE procedures. Rec. Doc. 19 at pp. 16–17; *see also* Rec. Doc. 1-2 at p. 76 (policy); *id*. at p. 16, ¶ 90.[7]

The Court should enforce the administrative subpoenas despite the *Cacho* policy. The OPSO tacitly concedes that the principal, if not exclusive, focus of the policy—ICE detainers—has no bearing on this case. *Compare* Rec. Doc. 19 at p. 17, *with* Rec. Doc. 1-1 at p. 15. The subpoenas do not order the OPSO to "initiate" its own immigration investigation into detainees it would not otherwise undertake; it simply asks for identification documents and information the OPSO routinely collects anyway. Similarly, the testimonial subpoenas do not require the OPSO's personnel to question detainees under oath; they are quite clear that ICE personnel will do so.

In sum, whether the *Cacho* policy is stayed, extant, or adversely impacted by the passage of recent, intervening state law is of no consequence to the Court's *Morton Salt* analysis.

### III. Conclusion

The United States has met its *Morton Salt* burden. The OPSO's opposition fails to identify any fatal deficiencies under that standard. To the extent the Court appreciates any technical defects in the administrative subpoenas, the United States stands ready to cure and reissue them, then engage in a good-faith dialogue with the OPSO to facilitate its compliance and responses in the least-burdensome manner possible. The Court should grant the United States' petition.

---

[7] While another division of the Court has held that the *Cacho* consent decree was not automatically stayed under the Prison Litigation Reform Act, that decision is on appeal to the Fifth Circuit.

Respectfully submitted,

DAVID I. COURCELLE
UNITED STATES ATTORNEY

*s/Peter M. Mansfield*

PETER M. MANSFIELD (#28671)
BROCK D. DUPRE (#28563)
Assistant United States Attorneys
U.S. Attorney's Office (E.D. La.)
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130-7212
Telephone: (504) 680-3047
Email: Peter.Mansfield@usdoj.gov
Brock.Dupre@usdoj.gov