UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | MISCELLANEOUS CASE |
| VERSUS | NO. 26-0113 |
| MICHELLE WOODFORK, in her official capacity as ORLEANS PARISH CRIMINAL SHERIFF | SECTION "O" (3) |

## <u>ORDER AND REASONS</u>

The United States Department of Homeland Security, Immigration and Customs Enforcement (ICE) filed this administrative subpoena enforcement action against the Orleans Parish Sheriff's Office (OPSO), through former Sheriff Susan Hutson in her official capacity as Orleans Parish Criminal Sheriff. Sheriff Michelle Woodfork has been substituted automatically as a respondent pursuant to Federal Rule of Civil Procedure 25(d).

ICE seeks to enforce subpoenas requiring OPSO to provide: (1) a list of all inmates in OPSO custody "who have failed to provide verifiable identity documents that correspond with lawful presence in the United States," including OPSO database information about these inmates (list subpoena);[1] (2) specific documents regarding

---

[1] R. Doc. 43-1 at 23. ICE revised the original subpoenas to reflect litigation developments.

1

nine inmates (document subpoenas);[2] and (3) physical production of six inmates to testify before ICE *or* facilitation of videoconferences for that purpose (testimony subpoenas).[3] OPSO refused to comply with the subpoenas. This enforcement action followed.

## I.    Background

Congress established ICE in 2002 as a federal law enforcement agency under DHS.[4] ICE's Enforcement and Removal Operations (ERO) program conducts operations to identify and arrest removable aliens.[5] ICE "routinely requests information from local, state and federal law-enforcement agencies and interviews with inmates in their custody."[6] ICE "also serves administrative subpoenas upon local and state custodians of prisons and jails where removable aliens may be located."[7] Those subpoenas frequently request that detention facilities produce information about inmates.[8] Although ICE has access to multiple nationwide databases, the

---

[2] *Id.* at 1–12, 21–22, 25–28.
[3] *Id.* at 13–20; R. Doc. 43-2 at 1–4.
[4] *See* Pub. L. No. 107–296, 116 Stat. 2135 (2002); R. Doc. 1-2 at 1–17 (uncontroverted declaration of Brian S. Acuna, Deputy Field Officer Director) (Acuna Declaration), ¶ 4.
[5] Acuna Decl. ¶ 5.
[6] *Id.* ¶ 7.
[7] *Id.*
[8] *Id.*

information in those databases is "often not up to date" and may include minimal details, for example, relative to criminal-history information.[9]

In addition to requesting documents and witness testimony, ICE may also issue an Immigration Detainer–Notice of Action (DHS Form I-247A) relative to inmates that ICE believes are potentially removable.[10] Through detainers, ICE requests that law enforcement agencies: (1) notify ICE forty-eight hours before releasing an inmate; and (2) detain the inmate for up to forty-eight hours after the scheduled release date so that ICE may assume custody.[11] Compliance with ICE detainers is voluntary. *See City of El Cenizo v. Texas,* 890 F.3d 164, 178 (5th Cir. 2018) ("The plaintiffs acknowledge that the Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement.") (citing *Printz v. United States,* 521 U.S. 898 (1997)).

Some state and local law enforcement agencies voluntarily honor ICE detainers, including through 287(g) partnerships.[12] In a 287(g) partnership, ICE and the nonfederal law enforcement agency agree that nonfederal officers "can perform

---

[9] *Id.* ¶ 8.
[10] *Id.* ¶ 9.
[11] *Id.* (citing 8 U.S.C. § 1357; 8 C.F.R. § 287.7).
[12] R. Doc. 1-2 at 73.

immigration-officer functions" under ICE training and supervision. *See id*. at 177; 8 U.S.C. § 1357(g).

In recent years, OPSO refused to honor more than 98% of ICE detainers.[13] OPSO also refuses to partner with ICE. That position originates from *Cacho v. Gusman*, No. 11-225, 2026 WL 656915 (E.D. La. Mar. 9, 2026). As recently summarized by the Division presiding over the *Cacho* case:

> The [*Cacho v. Gusman*] lawsuit was initiated in 2011 by two individuals alleging the Orleans Parish Sheriff held them in custody without lawful authority for months after the applicable hold request from the United States Immigration and Customs Enforcement ("ICE") had expired. The parties settled and the Court entered a consent decree in 2013, which required the Sheriff to maintain a policy concerning ICE detainer requests. Among other things, the policy requires that the Sheriff decline all voluntary ICE detainer requests except when the individual is charged with First Degree Murder, Second Degree Murder, Aggravated Rape, Aggravated Kidnapping, Treason, or Armed Robbery with Use of a Firearm. The policy provides that "OPSO officials shall not initiate any immigration status investigation into individuals in OPSO custody or affirmatively provide information on an inmate's release date or address to ICE." It also requires that "Absent a court order, OPSO shall not allow ICE to conduct civil immigration status investigations at OPSO or otherwise interview an inmate before the detainee's first appearance."

---

[13] Acuna Decl. ¶ 13.

4

*Id.* at *1 (citations omitted).[14] Although the United States[15] maintains that the consent decree no longer governs OPSO, that issue is not before the undersigned. *See id.* at *2 (denying motion to consolidate and observing, "In other words, while the United States might argue that the consent decree *should be* terminated, it cannot obtain a ruling in [this] administrative subpoena action that the consent decree *has been* terminated.") (emphasis original). Pursuant to the *Cacho* litigation, the consent decree remains in effect.

Based upon OPSO's prior failures to honor ICE detainers, ERO issued a series of administrative subpoenas in late 2025.[16] OPSO refused to comply with the subpoenas, citing its *Cacho* policy.[17] This enforcement action followed.

## II.    Standard of Law

### A.    ICE has broad statutory authority to issue administrative subpoenas for documents and testimony.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S.

---

[14] OPSO can choose to provide less immigration enforcement assistance than contemplated by *Cacho.* For example, although Umanzor-Juarez has four pending charges for armed robbery with use of a firearm, OPSO has refused to cooperate in ICE's investigation of him. *Id.* ¶¶ 13, 60; *see also* R. Doc. 1-2 at 76 (*Cacho* policy).
[15] The federal government is not a party to the consent decree. While the decree restricts OPSO's discretion to act voluntarily, it does not shield OPSO from complying with federal law.
[16] Acuna Decl. ¶ 14.
[17] *See, e.g.,* R. Doc. 1-2 at 68–72 (email correspondence).

5

387, 394 (2012). Congress enacted 8 U.S.C. § 1225(d)(4)(A) to empower ICE to propound administrative subpoenas for witness testimony and documents.

> The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and to that end may invoke the aid of any court of the United States.

The Supreme Court has confirmed that the statute authorizes ICE to use subpoenas for a broad range of inquiries. *See United States v. Minker*, 350 U.S. 179, 184–86 (1956) (analyzing 8 U.S.C. § 1225(d)(4)(A)'s predecessor statute). If the subject of a subpoena does not comply, § 1225(d)(4)(B) authorizes ICE to seek an order requiring compliance.

"An administrative agency's authority to issue subpoenas is a creature of statute." *CFPB v. Source for Pub. Data*, 903 F.3d 456, 458 (5th Cir. 2018). In *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950), the Supreme Court established the test for whether an administrative subpoena is within an agency's statutory authority. Under *Morton Salt*, the proponent of an administrative subpoena must satisfy three requirements: (1) the inquiry is within the authority of the agency; (2) the demand is not too indefinite (i.e., unreasonably broad or burdensome); and (3) the information sought is reasonably relevant to the inquiry. *Id.* at 652; *see also*

6

*Burlington N.R. Co. v. Off. of Inspect Gen.,* 983 F.2d 631, 638 (5th Cir. 1993). "The gist of the protection is in the requirement [] that the disclosure sought shall not be unreasonable." *Morton Salt*, 338 U.S. at 652–53 (quotation and citation omitted). If the agency shows that its subpoena complies with *Morton Salt*, the burden shifts to the subpoena recipient to show that enforcing the subpoena would be an abuse of judicial process. *See United States v. Powell*, 379 U.S. 48, 58 (1964); *United States v. Davis*, 636 F.2d 1028, 1034 (5th Cir. 1981).

**B.    The anticommandeering rule limits the federal government's ability to control state and local governments.**

The *Morton Salt* standard addresses only statutory authority. Agency power is also subject to constitutional constraints, including the Tenth Amendment's anticommandeering rule. Although the anticommandeering rule "may sound arcane," it simply recognizes that the Constitution "withhold[s] from Congress the power to issue orders directly to the States." *Murphy v. NCAA,* 584 U.S. 453, 470 (2018).

The pioneering case to articulate the anticommandeering rule is *New York v. United States*, 505 U.S. 144, 175 (1992), which concerned a federal law requiring States to "take title" to radioactive waste or "regulate according to the instructions of Congress." The Supreme Court observed, "We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or

7

prohibit those acts." *Id.* at 166. The Court held that the take-title provision was an unconstitutional mandate of state regulation. *See id.* at 180.

Five years later, the Court applied the anticommandeering rule to invalidate a federal law requiring state cooperation on gun background checks. *See Printz v. United States*, 521 U.S. 898, 935 (1997). *Printz* involved a provision of the Brady Act that required state law enforcement to both search and analyze state databases to determine whether a gun purchase would violate federal law. *See id.* at 903. The Supreme Court held that requirement unconstitutional:

> The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are incompatible with our constitutional system of dual sovereignty.

*Id.* at 935.

The Court identified three ways in which the anticommandeering rule is an important safeguard on federal power. First, the anticommandeering rule promotes a "healthy balance of power between the States and the Federal Government [and reduces] the risk of tyranny and abuse from either front." *Id.* at 921 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)). Second, the rule "promotes political accountability" such that voters "know who to credit or blame" for a particular regulation. *Murphy*, 584 U.S. at 473. Third, it "prevents Congress from shifting the

8

costs of regulation to the States." *Id.* at 474. As discussed below, the "anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Id.* at 475–76.

## III.    Analysis

OPSO and Umanzor-Juarez challenge the subpoenas on both statutory and constitutional grounds. "Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Jean v. Nelson,* 472 U.S. 846, 854 (1985) (quotation and citation omitted). Here, that "fundamental rule of judicial restraint" focuses the inquiry on what Congress and ICE have done, rather than what they could do. *See id.*

### A.    OPSO must comply with the list subpoena, subject to the modification discussed at oral argument.

In a recent three-month period, ICE issued five administrative subpoenas for a list of OPSO inmates with certain characteristics. OPSO stores relevant inmate data, including information from booking or identity documents, in a searchable database (AS400).[18] After receiving more information about how OPSO maintains its data, ICE propounded and seeks to enforce a single revised list subpoena.[19] It requests:

---

[18] R. Doc. 37.
[19] R. Doc. 43.

> A list of all inmates in your custody who have failed to provide verifiable identity documents that correspond with lawful presence in the United States. For this list, please include the following information about the subject: name, date of birth, demographic information (if applicable), passport numbers (if available). (Related to OPSO AS400 data fields 108/118/121/141/143/144/149/184/186/1160/100/342/357/954/966/47/1157/1159/1160/313)[.]

Much of this information is publicly available.[20] The list subpoena seeks additional nonpublic information, however, such as inmates' drivers' license numbers and states, U.S. citizenship, and country codes.

### 1. The modified list subpoena satisfies the *Morton Salt* standard.

Section 1225(d)(4)(A) authorizes ICE to subpoena "the production of books, papers, and documents." OPSO maintains that the list subpoena goes beyond the statute by requiring OPSO to create a list that does not already exist.

As with any electronic data, OPSO may need to transfer, copy, or convert that data before production. "Case law makes clear that simply searching a database and providing the results therefrom does not require creation of a new document beyond

---

[20] *See* Hr'g Tr. 36:2–9; *see also* LOUISIANA COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATION OF CRIMINAL JUSTICE, *LA VINE Rosters*, https://lcle.la.gov/programs/lavine/lavine_rosters or https://perma.cc/NX7Y-4EQH (last accessed May 9, 2026) (discussing publicly available "roster" of OPSO inmates); *see also Huskey v. Jones*, 45 F.4th 827, 830 n.3 (5th Cir. 2022). OPSO does not contend that ICE is seeking information already in its possession. *See Powell*, 379 U.S. at 57–58.

the scope of Rule 34." *Humphrey v. LeBlanc*, No. CV 20-233-JWD-SDJ, 2021 WL 3560842, at *3 (M.D. La. Aug. 11, 2021) (citations omitted); *see also* Fed. R. Civ. P. 34 advisory committee's note (confirming that a "respondent may be required to use his devices to translate the data into usable form"). Standing alone, ICE's request for data from OPSO is not an impermissible demand to create a new document.

The problem with the list subpoena is that it also requires OPSO to analyze and determine the information in a particular data field indicating that an inmate's status may not be legal.[21] The list subpoena could require OPSO to evaluate, for example, whether the absence of a driver's license number sufficiently suggests lack of lawful presence. This ambiguity appears inadvertent. At oral argument, ICE confirmed that it is not demanding that OPSO undertake an independent analysis.[22] Rather, ICE is seeking raw data from which the agency may draw its own conclusions. Thus, the Court will not enforce the part of the subpoena that requires OPSO to analyze its information and conclude which inmates "failed to provide verifiable identity documents that correspond to lawful presence in the United States." Instead, ICE may provide OPSO with specific search parameters (like those discussed by ICE

---

[21] R. Doc. 43-1 at 23.
[22] Hr'g Tr. at 16:4–10.

11

at oral argument[23]) to use in searching its database. As modified, the list subpoena should not require OPSO to spend hours auditing its records to "generate new information." *See Leonard v. Martin,* 38 F.4th 481, 490 (5th Cir. 2022).

OPSO's next objection is that the list subpoena is unduly burdensome. OPSO has presented no evidence that searching the database will pose a burden—much less an undue one. *See United States Immigr. & Customs Enf't v. Gomez*, 445 F. Supp. 3d 1213, 1215 (D. Colo. 2020) (finding that the cost of providing readily available information contained in an arrested person's criminal file is insignificant). "[T]he mere fact that compliance with the subpoenas may require" an extensive document production is insufficient. *NLRB v. GHR*, 707 F.2d 110, 114 (5th Cir. 1982). And OPSO's concern about potential serial subpoenas is premature because "the hypothetical risk of responding to future subpoenas alone" is not an undue burden. *See Rardon v. Falcon Safety Prods.*, No. 23-1594, 2023 WL 5347298, at *3 (3d Cir. Aug. 21, 2023). Finally, OPSO suggested at oral argument that its personnel historically have left the fields of greatest interest to ICE blank because of OPSO's position on immigration enforcement.[24] But ICE is entitled to discover that

---

[23] ICE suggested, for example, that OPSO could produce a list of inmates for whom the social security number or birth-state fields are blank. *Id.* at 15:13–16:3.

[24] *See id.* at 25:2–20. The seminal law review article on federal commandeering of state information describes this dynamic. Robert A. Mikos, *Can the States Keep*

12

information (or its absence) in the first instance. *See Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 216 (1946) (confirming that "forecasts of the probable result" of a subpoena do not determine its enforceability).

In its post-hearing brief, OPSO objected to the list subpoena as a "fishing expedition."[25] This objection is untimely. And, in any event, the "fishing expedition" argument is a nonstarter.

In *Morton Salt*, the U.S. Supreme Court held that courts should not "engraft" judicial limitations (including a prohibition on "fishing expeditions") on administrative investigations. *Morton Salt Co.*, 338 U.S. at 641. An agency can subpoena information to satisfy "official curiosity" or "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642, 652. In short, agencies can "go fishing," provided that their actions comply with the *Morton Salt* requirements and are not an abuse of the judicial process. *See id.* at 642; *Powell*, 579 U.S. at 57–58.[26] Because the "evidence sought by the subpoena

---

*Secrets from the Federal Government*, 161 U. Pa. L. Rev. 103, 129, 131 (2012) ("ICE relies heavily upon state law enforcement data . . . . Currently, the only way state officials can avoid serving as the tools of federal law enforcement is to take the drastic step of abandoning monitoring altogether.").

[25] R. Doc. 44 at 5.

[26] *See also United States v. R. Enters.*, 498 U.S. 292, 299 (1991) ("Grand juries are not licensed to engage in *arbitrary* fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass.") (emphasis added).

13

[is] not plainly incompetent or irrelevant to any lawful purpose of" ICE, the Court's duty is to "order its production." *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943).

### 2. Enforcing the subpoenas will not abuse the judicial process.

Even when a subpoena is within an agency's authority, not unduly burdensome, and relevant to the agency's inquiry (i.e., it satisfies *Morton Salt*), courts will not enforce a subpoena if doing so is an abuse of the judicial process. *See Powell*, 379 U.S. at 58; *United States v. Davis*, 636 F.2d at 1034. An abuse of judicial process may take place when subpoenas were issued for an improper purpose, "such as to harass [the recipient] or to put pressure on [the recipient] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 313–14 (1978) (quotation and citation omitted). The analysis is fact-specific and context-dependent. *See id.* at 314–17. When a subpoena satisfies *Morton Salt*, the respondent's burden of demonstrating an abuse of process "is a heavy one." *See id.* at 316.

OPSO argues that the testimony subpoenas reflect an improper purpose because they require the physical production of an inmate. The Court's enforcement

14

of only the videoconference protocol[27] moots this argument.[28] Umanzor-Juarez's remaining abuse-of-process claim hinges on the premise that ICE is using subpoenas to control and punish OPSO because it has been uncooperative.[29] The Court considers the subpoenas collectively in connection with this issue.

Umanzor-Juarez points to evidence that ICE used the subpoenas to pressure OPSO (unsuccessfully) to cooperate with ICE.[30] ICE does not deny that it: (1) wants OPSO to cooperate; and (2) is resorting to subpoenas because of OPSO's noncooperation. Indeed, ICE avers: "Based upon OPSO's prior failures to honor ICE detainers, ERO issued Immigration Enforcement Subpoenas to OPSO . . . ."[31] Thus, ICE's motive is not in dispute. By their very nature, however, subpoenas can be coercive. ICE's use of subpoenas to obtain information over OPSO's objection is not an improper purpose.[32]

---

[27] Section III.C.

[28] Umanzor-Juarez, moreover, may address this argument if ICE files an enforcement action against him.

[29] R. Doc. 55 at 17–18; *see also New York*, 505 U.S. at 181–82 (explaining that commandeering is impermissible even when a state consents because federalism is for the protection of individuals).

[30] R. Doc. 55 at 18–19.

[31] Acuna Decl. ¶ 14.

[32] An agency action may be in bad faith if its purpose is "to put pressure on [the recipient] to settle a *collateral* dispute." *Powell*, 379 U.S. at 58 (emphasis added). Here, however, the litigation is not "collateral." ICE's enforcement action arises directly from its dispute with OPSO about sharing inmates' information.

Umanzor-Juarez maintains that "[t]he only legitimate purpose of a subpoena is to inquire."[33] Umanzor-Juarez has not shown, however, that any other purpose motivated ICE. The uncontroverted record confirms ICE is investigating OPSO inmates who may lack legal status. Umanzor-Juarez and OPSO's disagreement with ICE's goal does not satisfy the heavy burden required to show an abuse of process.

### 3.    The modified list subpoena does not present a commandeering problem.

OPSO argues that the list subpoena parallels the Brady Act provision held unconstitutional under the Tenth Amendment in *Printz*. In *Printz*, however, the Supreme Court emphatically declined to address whether information-sharing directives violate the anticommandeering rule. It noted that statutes "which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918.[34] Thus, that decision does not control today's result.

Although *Printz* did not decide the precise issue before the Court, its analysis and later jurisprudence undermine OPSO's argument. By seeking only raw data, ICE

---

[33] R. Doc. 55 at 16 (citing *United States v. Clarke,* 573 U.S. 248, 254 (2014)).

[34] Justice O'Connor, who authored the majority opinion in *New York v. United States*, 505 U.S. 144, wrote separately in *Printz* to emphasize that "ministerial reporting" requirements were not at issue. *Printz*, 521 U.S. at 935–36 (O'Connor, J., concurring).

16

is not demanding that OPSO address a federal problem nor administer a federal regulatory program. *See id.* at 935. Nor is ICE insisting that OPSO analyze the data that it collects.[35] Other lower courts have concluded that federal demands for existing data do not violate the anticommandeering rule. *See United States v. Brown*, No. 07 CR.485 (HB), 2007 WL 4372829, at \*4–6 (S.D.N.Y. Dec. 12, 2007), *aff'd*, 328 F. App'x 57 (2d Cir. 2009); *see also Freilich v. Upper Chesapeake Health, Inc.* 313 F.3d 205, 214 ("All that the [Act] requires of states is the forwarding of information."). OPSO offers no persuasive reason for this Court to conclude otherwise.

In the alternative, the list subpoena survives a Tenth Amendment challenge because § 1225(d)(4)(A) grants ICE a subpoena power that extends to public and private entities alike. *Reno v. Condon,* 528 U.S. 141, 151 (2000), addressed the constitutionality of information-management requirements imposed by the federal government on States in the Driver's Privacy Protection Act (DPPA). The federal government argued that its demand for information did not implicate state sovereignty because both private and public actors could be subject to similar

---

[35] In *Haaland v. Brackeen*, 599 U.S. 255, 291 (2023), the Supreme Court held that Congress can "impose ancillary recordkeeping requirements related to state-court proceedings." That case, however, implicated state courts' obligations to apply federal law (dual sovereignty). *See id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)).

17

requirements. The Fourth Circuit rejected this argument and held the DPPA unconstitutional because "there is no private counterpart to a state Department of Motor Vehicles." *See Reno v. Condon*, 155 F.3d 453, 461 (4th Cir. 1998), *rev'd,* 528 U.S. 141 (2000); *see also Printz*, 521 U.S. at 932 n.17.

In reversing the Fourth Circuit, the Supreme Court emphasized that, while the data originated in a uniquely government database, the law at issue applied equally to private and public entities. "The DPPA's provisions do not apply solely to States. The Act also regulates the resale and redisclosure of drivers' personal information by private persons who have obtained that information from a state DMV." *Reno v. Condon,* 528 U.S. at 146; *see also Haaland*, 599 U.S. at 286 (holding that the Indian Child Welfare Act did not violate the anticommandeering rule, including because its requirements did not implicate a power that is uniquely sovereign).

As in *Reno v. Condon*, the federal government seeks information that OPSO has compiled as a database owner.[36] *See Reno v. Condon,* 528 U.S. at 142. The list subpoena does not require OPSO to act in a manner that is uniquely sovereign. *See*

---

[36] *See* Lindsay Nash, *The Immigration Subpoena Power*, 125 Colum. L. Rev. 1, 50 (2025) (observing that ICE subpoenas private employers for information that includes employees' addresses, work schedules, and emergency contacts).

18

*Haaland*, 599 U.S. at 286; *Murphy*, 584 U.S. at 475–76. For this alternative reason, the list subpoena does not violate the anticommandeering rule.

### 4.   The list subpoena does not violate Umanzor-Juarez's Fourth Amendment rights.

Umanzor-Juarez alleges that the witness and list subpoenas violate the Fourth Amendment. Yet he does not explain how he has an expectation of privacy in personal information once it passes into OPSO's hands. *See Niemic v. Maloney*, 448 F. Supp. 2d 270, 277 (D. Mass. 2006), *aff'd in part sub nom. Niemic v. Galas*, 286 F. App'x 738 (1st Cir. 2008); *see also Carpenter v. United States*, 585 U.S. 296, 318 (2018). Further, *Morton Salt* incorporates the Fourth Amendment reasonableness standard that applies to administrative subpoenas. *See McClendon v. Jackson Television, Inc.*, 603 F.2d 1174, 1177 (5th Cir. 1979). Thus, for reasons that are coextensive with the *Morton Salt* analysis, Umanzor-Juarez's Fourth Amendment challenge fails.

### B.   OPSO must comply with the inmate-specific document subpoenas.

ICE seeks certain documents from OPSO related to nine named inmates. The inmate-specific document subpoenas request, for example, documents on Umanzor-Juarez's person when arrested or that relate to his criminal charges and bond.[37]

---

[37] R. Doc. 43-1 at 7.

19

ICE credibly maintains that the information would help it identify non-citizens, investigate the legality of their presence in the United States, contact or locate them, and establish their criminal history.[38] This satisfies *Morton Salt. See United States v. Multnomah Cnty. Dep't of Cmty. Just.*, No. 25-CV-01784-MC, 2025 WL 3267361, at *3 (D. Or. Nov. 24, 2025). As with the other subpoenas, OPSO provides no evidence of an undue burden. Finally, for reasons that overlap with those discussed above, OPSO's subpoenas for inmate-specific documents do not violate the anticommandeering rule.

### C. OPSO must facilitate videoconference communications between ICE and inmates subject to enforceable[39] testimony subpoenas.

#### 1. ICE cannot use testimony subpoenas to require OPSO to transfer custody of or physically produce an inmate.

The testimony subpoenas before the Court require inmates to appear at an ICE office "and/or video conferencing platform" to testify before a particular "CBP [U.S. Customs and Border Protection], ICE or USCIS [U.S. Citizenship and Immigration Services] Official."[40]

The office-appearance and videoconference options warrant separate analysis. OPSO maintains that the office-appearance option impermissibly requires OPSO

---

[38] R. Docs. 1-1 at 14, 1-2 at ¶ 17.

[39] That is, the inmate has not objected to testifying or the Court has overruled any such objection in an enforcement action.

[40] *See, e.g.*, R. Doc. 43-1 at 13.

personnel to transport inmates to ICE custody, wait for their interview to conclude, then transport them back to OPSO's facilities if ICE relinquishes the inmates.[41]

Section 1225(d)(4)(A) authorizes administrative subpoenas only to require "the attendance and testimony of witnesses before immigration officers." The statute says nothing about transporting a witness, transferring custody, or anything else that would bridge the gap between ICE's objective and OPSO's refusal to cooperate voluntarily.[42] There is no reading of the administrative subpoena statute that would allow ICE to use a testimony subpoena to obtain custody of inmates over a local detention facility's objection.

Separate statutory constraints support the conclusion that ICE cannot use a testimony subpoena to compel inmate custody transfers. As set forth above, legislation confirms that state or local cooperation with detainers must be voluntary. The habeas corpus statute similarly indicates that custody transfers are unavailable in the administrative subpoena context.

---

[41] R. Doc. 19 at 16. Although ICE states it would not take custody of a state or local inmate serving a sentence, OPSO inmates include pretrial detainees. *See* R. Doc. 28 at 5 n.4.

[42] OPSO argues that regulations and past agency practice support its position. The Court need not reach those items because the subpoena and habeas corpus statutes are unambiguous. Relatedly, although Umanzor-Juarez urges the interpretive canon of constitutional avoidance, the Court need not rely on it. *See Clark v. Martinez*, 543 U.S. 371, 381 (2001).

21

28 U.S.C. § 2241 codifies the common law writ of habeas corpus. The statute enumerates the limited circumstances when federal courts can order that law enforcement produce a prisoner:

**(c)** The writ of habeas corpus shall not extend to a prisoner unless--

**(1)** He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

**(2)** He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

**(3)** He is in custody in violation of the Constitution or laws or treaties of the United States; or

**(4)** He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

**(5)** It is necessary to bring him into court to testify or for trial.

The habeas corpus statute covers everything from the "Great Writ" (subsection 3) to the less celebrated yet highly relevant writ of habeas corpus ad testificandum (subsection 5), which authorizes courts to order production of an inmate to testify or attend trial. *See also Michelin v. Warden Moshannon Valley Corr. Ctr.*, 169 F.4th 418, 422 (3d Cir. 2026).

22

Under the common law, the writ of habeas corpus ad testificandum was necessary "for the production of witnesses who are confined in jail and who are thus beyond the reach of the ordinary subpoena." *Neufield v. United States*, 118 F.2d 375, 385 (D.C. Cir. 1941); *see also In re Thaw*, 166 F. 71, 75 (3d Cir. 1908) (observing that "a subpoena would be of no avail" for an incarcerated witness). Given that ICE's administrative subpoenas involve neither court testimony nor a trial, § 2241(c)(5) does not authorize the custody transfer or physical presentation demanded by ICE.

ICE maintains that the All Writs Act provides an alternative basis for the Court to order OPSO to produce inmates in-person. That statute instructs: "[T]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31 (2002) (quoting 28 U.S.C. § 1651(a)). The All Writs Act must be read in conjunction with other statutes. "'Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling.'" *Id.* at 32 (quoting *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985)). The All Writs Act does not permit the Court to ignore the specific constraints of the habeas corpus statute.

23

The statutes discussed above unambiguously preclude ICE from using an administrative subpoena to require an inmate's physical production or transfer. ICE contends that this leaves the United State with "no viable options to secure sworn testimony from detainees in Orleans Parish" and "Congress surely did not intend such an anomalous result."[43] But the United States has other mechanisms to obtain testimony from an inmate, including in civil and criminal cases. And, in any event, "Fifth Circuit law is crystal clear that" courts should not look beyond statutory text "when, as here, the language of a statute is unambiguous." *See Copeland v. Comm'r*, 290 F.3d 326, 333 n.14 (5th Cir. 2002) (quotation and citation omitted).

### 2. The witness subpoenas for videoconferences with inmates satisfy *Morton Salt*.

The statutory problems with the testimony subpoenas' demand for an inmate's in-person production or custody transfer do not extend to their alternative demand for a videoconference interview. The subpoena statute, 8 U.S.C. § 1225(d)(4)(A), does not contain a carveout for incarcerated witnesses. And the habeas corpus statute does not address videoconferences. Thus, ordering OPSO to facilitate videoconference testimony complies with both statutes. Even if any statutory gap remains, the All Writs Act, 28 U.S.C. § 1651, can fill it because no other statute "address[es] the

---

[43] R. Doc. 28 at 4.

24

particular issue at hand." *Syngenta Crop Prot., Inc.*, 537 U.S. at 31 (quotation and citation omitted).

The United States brought this enforcement action only against OPSO. The witnesses named in the subpoenas remain free to object to testifying. If necessary, the Court can rule on those objections at the proper time. As far as OPSO is concerned, however, it must facilitate videoconference interviews when OPSO inmates are subject to enforceable testimony subpoenas. *See also Sec. & Exch. Comm'n v. Arthur Young & Co.*, 584 F.2d 1018, 1033 (D.C. Cir. 1978) ("[I]n formulating protective conditions for administrative subpoenas, courts may resort analogously to techniques conventional to judicial subpoenas.").

### 3. Requiring OPSO to make inmates available to testify via videoconference does not violate the anticommandeering rule.

OPSO maintains that the Tenth Amendment precludes the Court from requiring OPSO to facilitate videoconferences. OPSO's argument is tenuous, at best. Requiring OPSO to facilitate videoconferences with inmates does not require it to address a particular federal problem, nor to administer or enforce a federal regulatory program. *See Printz*, 521 U.S. at 935. And while OPSO repeatedly refers to limited

25

financial and human resources, OPSO presented no supporting evidence.[44] Directing OPSO to undertake a non-regulatory activity that indirectly furthers the federal government's objectives does not violate the anticommandeering rule.

### D.    The *Cacho* policy does not excuse OPSO's noncompliance with ICE's administrative subpoenas.

OPSO maintains that its *Cacho* policy excuses compliance with the subpoenas for several reasons. OPSO emphasizes that the policy precludes voluntary cooperation with ICE detainers. The subpoenas for an inmate list, documents, and videoconference testimony, however, do not involve detainers. And court-ordered cooperation is not voluntary. OPSO argues next that *Cacho* prohibits it from initiating immigration enforcement investigations. ICE initiated this investigation. Relatedly, Umanzor-Juarez argues that *Cacho* prohibits OPSO from providing ICE with, e.g., bond documents because they contain inmate addresses and release dates.[45] The *Cacho* policy, however, only restricts OPSO from "affirmatively provid[ing] information on an inmate's release date or address to ICE."[46] "[P]arties may not use a consent decree to limit non-party rights that would otherwise prevail."

---

[44] At oral argument, OPSO confirmed that it routinely produces inmates for interviews via videoconference, including for matters unrelated to inmates' pending criminal charges. Hr'g Tr. at 26:9–19.

[45] R. Doc. 45-1 at 6.

[46] R. Doc. 1-2 at 76.

*See United States v. Bleznak*, 153 F.3d 16, 19 (2d Cir. 1998).[47] The *Cacho* policy thus does not shield OPSO from administrative subpoena enforcement actions.

Finally, OPSO suggested at oral argument that the *Cacho* policy prohibits ICE interviews because it requires notification of defense counsel in certain instances. Whether a witness interview is part of a criminal investigation is fact specific.[48] OPSO is free to notify inmates' defense counsel of any interview with ICE. Nothing in today's opinion modifies ICE's existing legal obligations, including under the Fifth Amendment. And inmates remain free to challenge interviews on a subpoena-by-subpoena basis. OPSO may not, however, rely on the *Cacho* policy to bar witness interviews.

## IV.    Conclusion

For these reasons, the subpoenas (as modified above) are within ICE's statutory and constitutional authority. The Court must review the final version of the subpoenas, however, before issuing an enforcement order.

Accordingly,

---

[47] The *Cacho* policy instructs, "*Absent a court order*, OPSO shall not allow ICE to conduct civil immigration status investigations at OPSO or otherwise interview an inmate before the detainee's first appearance." R. Doc. 1-2 at 76 (emphasis added).
[48] ICE acknowledges that the information it seeks may be probative of certain federal crimes. *See* Acuna Decl. ¶¶ 18–19.

**IT IS ORDERED** that ICE modify the subpoenas consistent with this ruling and file them for the Court's final pre-enforcement review and approval. The list and testimony[49] subpoenas should reflect the changes discussed above. The document subpoenas need not vary in substance. The subpoenas should set a return date at least 28 days from ICE's filing. The only objection that OPSO or Umanzor-Juarez may raise at this stage is the (unlikely) position that the final versions violate today's ruling. Any such objection is due within two business days of ICE's filing.

**IT IS FURTHER ORDERED** that this Order is **WITHOUT PREJUDICE** to the right of individual inmates to object to the testimony subpoenas.

New Orleans, Louisiana, this 11th day of May 2026.

_____
EVA J. DOSSIER
UNITED STATES MAGISTRATE JUDGE

---

[49] The Court's potential approval of the language in the testimony subpoenas extends only to form (i.e., ICE may not demand an inmate's in-person appearance). Inmates retain the right to object to testimony subpoenas.

28