UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | MISCELLANEOUS CASE |
| | * | |
| VERSUS | * | NO. 26-mc-113 |
| | * | |
| MICHELLE WOODFORK, in her official capacity as ORLEANS PARISH CRIMINAL SHERIFF | * | SECTION: "O" (3) |
| | * | |
| | * | JUDGE BRANDON LONG |
| | * | |
| | * | MAGISTRATE JUDGE EVE DOSSIER |

**INTERVENOR TEONY UMANZOR-JUAREZ'S MEMORANDUM IN SUPPORT OF MOTION FOR REVIEW OF AND OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Immigration and Customs Enforcement ("ICE") issued administrative subpoenas in this case demanding that the Orleans Parish Sheriff's Office ("OPSO") facilitate interviews with specific people in OPSO custody, and that it provide documentation containing personal information about those same people and three others. ICE also demands what amounts to a list of everyone in OPSO custody so that it may comb through those records to determine if any person on the list is removable from the United States. In its Order and Reasons ("Order and Reasons"), R. Doc. 56, and Report and Recommendation ("R&R"), R. Doc. 59, Magistrate Judge Eve Dossier recommended that the Court find that such requests do not exceed the power granted to ICE by statute, abuse the Court's process, or violate the Tenth Amendment. R. Doc. 56.

However, nothing in the Immigration and Nationality Act's ("INA") administrative subpoena statute, 8 U.S.C. § 1225(d)(4)(A), entitles ICE to the cooperation of a potential witness' custodian. Nor does the statute authorize broad subpoenas concerning unnamed, unknown persons without alleging even a whiff of wrongdoing. Further, ICE issued these

subpoenas as part of a pattern and practice of harassing OPSO in hope that it would violate this Court's order in a collateral case. Finally, a statute that allows ICE to force OPSO and facilitate ICE interviews would unlawfully commandeer OPSO resources in violation of the Tenth Amendment. Accordingly, Intervenor Teony Umanzor-Juarez objects.

## BACKGROUND

In 2013, this Court entered a consent decree in *Cacho v. Gusman*, settling claims that OPSO unconstitutionally detained the plaintiffs pursuant to ICE detainers for months past their release dates. No. 11-225, 2026 WL 456587, at *1-2 (E.D. La. Feb. 18, 2026). The *Cacho* consent decree requires that OPSO "decline all voluntary ICE detainer requests" unless the person is charged with certain crimes. *Id*. A detainer is a voluntary request for a law enforcement agency to hold a noncitizen past their release date so that ICE may arrest them. *See* 8 C.F.R. § 287.7. The federal government twice filed briefs in *Cacho* requesting that this Court end the decree. *See Cacho*, No. 11-cv-225, R. Doc. 134 (E.D. La. Apr. 23, 2025); R. Doc. 146 (E.D. La. Jul. 23, 2025). The consent decree remains in effect. *Cacho*, 2026 WL 456587, at *10.

On April 28, 2025, President Trump signed Executive Order 14287, directing federal agencies to deny federal funding to "sanctuary jurisdictions" that limit cooperation with ICE. Exec. Order No. 14287, 90 FR 18761-62 (2025). On August 5, 2025, the federal government included New Orleans on the list of jurisdictions from which funding would be withheld.[1] The Department of Homeland Security ("DHS") then withheld $120 million of Hurricane Katrina recovery funding from New Orleans on account of its "sanctuary jurisdiction" status.[2]

---

[1] Dep't of Justice, *Justice Department Publishes List of Sanctuary Jurisdictions*, Aug. 5, 2025, https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.
[2] Katie Jane Fernelius, *Loss of $120M in expected FEMA funding threatens city's ability to pay bills, officials say*, Verite News, Oct. 22, 2025, https://veritenews.org/2025/10/22/fema-funding-trump-new-orleans-budget-crunch/.

Between October 2025 and January 2026, ICE issued subpoenas to OPSO demanding that OPSO produce six named people for interviews at the ICE Field Office, documents concerning those six people and three others; and lists of all suspected noncitizens in OPSO custody. *See* R. Doc. 1-2 ¶¶ 14, 20, 75–85. ICE previously issued detainers for all nine noncitizens. *Id.* ¶ 14.

On December 11, 2025, DHS, the parent agency of ICE, issued a press release criticizing New Orleans for its "sanctuary policies."[3] On January 8, 2026, ICE Deputy Field Office Director ("DFOD") Brian Acuna sent an email titled "ICE Subpoenas" to OPSO. R. Doc. 1-2 at 72. In it, DFOD Acuna wrote, "I once again renew my advice to the OPSO that the Sheriff or her delegate withdraw your 2013 sanctuary policy and come into full compliance with ICE access to your facility…and honor each and every detainer that ICE files and that ICE has already filed." *Id.* DFOD Acuna also attempted to circumvent the *Cacho* consent decree, which governs OPSO detainer policy, stating "[i]t makes no sense going into research and case law, when the settlement language attached clearly states your policy should have remained in effect, only until . . . May 2024." *Id.* at 73. He then claimed that one part of the *Cacho* policy "violates federal immigration law." *Id.* DFOD Acuna concluded, "attached information on all three ICE 287(g) partnerships[4] available to you as of today. The Sheriff has only to make an application at our website." *Id.*

On January 16, 2026, the federal government petitioned this Court to enforce the subpoenas against then-Sheriff of Orleans Parish, Susan Hutson. *See* R. Doc. 1. In his declaration

[3] Dep't of Homeland Sec'y, *Catahoula Crunch Continues Cracking Down on Criminal Illegal Aliens in New Orleans,* Dec. 11, 2025, https://www.dhs.gov/news/2025/12/11/catahoula-crunch-continues-cracking-down-criminal-illegal-aliens-new-orleans.
[4] A 287(g) partnership is a voluntary agreement between a nonfederal law enforcement agency and ICE in which the nonfederal agency agrees to act as immigration enforcement under ICE training and supervision. *See City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018); 8 U.S.C. § 1357(g)(10)(A)-(B).

in support of the petition, DFOD Acuna stated that ICE issued the subpoenas "[b]ased upon OPSO's prior failures to honor ICE detainers." R. Doc. 1-2, ¶14. On February 8, 2025, CBS News published a story in which DFOD Acuna criticized OPSO for its lack of cooperation with ICE detainers, complained that OPSO has not cooperated "since 2013," and stated that ICE was working "every day" to obtain a higher level of cooperation from OPSO.[5]

On January 23, 2026, the Court referred the matter to Magistrate Judge Eva J. Dossier pursuant to 28 U.S.C. § 636(b). R. Doc. 3. On March 17, 2026, after a round of briefing by OPSO and Petitioner, the Magistrate Judge held a show cause hearing. R. Doc. 40. The next day, the Magistrate Judge ordered Petitioner to submit revised subpoenas and allowed OPSO to file objections to the revised subpoenas. R. Doc. 42.

On March 24, 2026, Petitioner filed its revised subpoenas. R. Doc. 43-1. On May 11, 2026, the Magistrate Judge granted Mr. Umanzor-Juarez's motion to intervene. R. Doc. 54. The same day, the Magistrate Judge issued the Order and Reasons, determining that the ICE subpoenas should be enforced subject to certain modifications. R. Doc. 56. Under the Order and Reasons, OPSO would be required to facilitate ICE video interviews with the six persons from whom ICE requested testimony and to provide a list of noncitizens to ICE, subject to ICE's provision of more detailed criteria as to who should appear on the list. *Id*. at 20-26, 9-14, 16-19. The Magistrate Judge found that, subject to those limitations, ICE issued its subpoenas for a lawful purpose and that the subpoenas complied with the Tenth Amendment and the INA subpoena statute, 8 U.S.C. § 1225(d)(4)(A). *Id*. at 14-19. The Magistrate Judge then ordered Petitioner to submit new subpoenas for court review. *Id*. at 28.

[5] Kati Weis, *As ICE ramps up immigration sweeps, New Orleans' sanctuary city status could be put to the test, CBS News*, Feb. 8, 2025, https://www.cbsnews.com/news/ice-immigration-sweeps-new-orleans-sanctuary-city-status-put-to-the-test/.

On May 18, 2026, Petitioner filed revised subpoenas. R. Doc. 57-1. Petitioner addressed six of these subpoenas to the same six persons from whom it sought testimony in its previous subpoenas and demanded that they appear for interviews "[v]ia videoconferencing platform" *Id*. at 1, 5, 9, 13, 17, 21. Petitioner also revised its list subpoena to demand that OPSO produce a list of the names and personal information of any person in OPSO custody who lack driver's license numbers, social security numbers, state of birth, or United States citizenship information in OPSO's database. *Id*. at 31.

On May 22, 2026, the Magistrate Judge issued the R&R, recommending that this Court enforce Petitioner's revised subpoenas. R. Doc. 59. The docket entry corresponding to R. Doc. 59 set a deadline of June 5, 2026, for objecting to the R&R.

## ARGUMENT

### I. STANDARD OF REVIEW

On January 23, 2026, this Court referred the petition to the Magistrate Judge "pursuant to 28 U.S.C. § 636(b)." R. Doc. 3. While the Court did not indicate which subsection of § 636(b) it invoked, the most logical fit is § 636(b)(1)(B), under which a magistrate judge may "conduct hearings, including evidentiary hearings, and . . . submit to a judge of the court proposed findings of fact and recommendations for the disposition by a judge of the court . . . ." 28 U.S.C. § 636(b)(1)(B). Under this section, portions of the report or proposed findings or recommendations to which objections are made are reviewed *de novo.* 28 U.S.C. § 636(b)(1)(C); *see also Darder v. Green Harbors, LLC*, No. CV 19-12492, 2020 WL 8872103, at *2 (E.D. La. June 10, 2020); *Davidson v. Georgia-Pac*., L.L.C., 819 F.3d 758, 762 (5th Cir. 2016) ("rulings by a magistrate judge on dispositive matters . . . are . . . recommendations subject to *de novo* review when properly challenged by the losing party.").

## II. OBJECTIONS

Whether a Court may enforce a subpoena is generally governed by the three-pronged test articulated in *United States v. Morton Salt*, 338 U.S. 632, 652 (1950): whether (1) the inquiry is within the statutory authority of the agency; (2) the demand not too indefinite; and (3) the information sought relevant. *C.F.P.B. v. Source for Public Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018) . Importantly, an agency's subpoena authority is "a creature of statute." *Id.*; R. Doc. 56 at 6. As Mr. Umanzor-Juarez argued in his briefing opposing the subpoenas, R. Doc 55, the testimonial and list subpoenas fail the *Morton Salt* test at the first prong: ICE exceeded its statutory authority in issuing these subpoenas, and this Court should find them unenforceable.

In addition, courts must quash administrative subpoenas "issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964). As Mr. Umanzor-Juarez explained in his brief, ICE issued its subpoenas to pressure OPSO into violating this Court's *Cacho* consent decree. R. Doc. 55 at 15-21. The subpoenas are therefore invalid.

Finally, the Tenth Amendment prohibits the federal government from commanding "the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). Requiring ICE to revise its subpoenas may perhaps lighten the load on OPSO to support ICE's deportation program, but the subpoenas still require OPSO to take tangible action in service of that program. As such, they still violate the Tenth Amendment. Accordingly, Mr. Umanzor-Juarez objects as follows.

**Objection 1: The Magistrate Judge Erred in Finding that ICE's Testimony Subpoenas Are Authorized by Statute.**

The Magistrate Judge found that Petitioner "brought this enforcement action only against OPSO," and that OPSO "must facilitate videoconference interviews when OPSO inmates are subject to enforceable testimony subpoenas." R. Doc. 56 at 25. The Order and Reasons provides two bases for these conclusions: first, the silence of the INA subpoena and habeas corpus ad testificandum statutes as to video facilitation; and second, authority under the All Writs Act to fill the gap created by the silence of the INA and the habeas corpus statutes. *Id*. at 24-25. These conclusions were erroneous, as none of these statutes authorizes an order compelling OPSO to facilitate interviews.

**A. The Relevant Statutes Do Not Empower a Court to Order Third Parties to Facilitate Administrative Interviews.**

The statutes providing for ICE's administrative subpoena power, 8 U.S.C. § 1225(d)(4), and for the habeas corpus ad testificandum writ, 28 U.S.C. § 2241, are silent as to whether either can be invoked to compel production of a person for videoconference. *See* R. Doc 56 at 24. This silence does not provide this Court authority to order what Congress has not explicitly allowed. Orders to enforce administrative subpoenas must be made only upon evaluation that "the subpoena was issued for lawful purpose within the statutory authority of the issuing agency." *Winters Ranch Partnership v. Viadero*, 123 F.3d 327, 329 (5th Cir. 1997); *see also Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946) (holding that a subpoena is enforceable when the administrative investigation is "for a lawfully authorized purpose, within the power of Congress to command.")

The immigration subpoena statute explicitly provides Congress' desired enforcement mechanism, proscribing ICE's authority. A court may remedy the "neglect or refusal to respond to a subpoena" by issuing "an order requiring such persons to appear before an immigration

officer, produce books, papers, and documents if demanded, and testify." 8 U.S.C. § 1225(d)(4)(B). The statute continues, "any failure to obey such order of the court may be punished by the court as a contempt thereof." *Id*.

The Magistrate Judge properly rejected ICE's argument that it could force OPSO to transport people to ICE custody, finding that § 1225(d)(4)(A) "says nothing about transporting a witness, transferring custody, or anything else that would bridge the gap between ICE's objective and OPSO's refusal to cooperate voluntarily." R. Doc. 56 at 21. The Magistrate Judge's rationale for requiring videoconference facilitation by OPSO seems to lie in the determination that the statute "does not contain a carveout for incarcerated witnesses," *id.* at 24, but this determination does not address the fact that the "gap" identified as to in-person facilitation of interviews exists for remote facilitation as well.[6] There is no explanation in the Order and Reasons as to why an inference of authority would be inappropriate in the case of in-person interviews—a position Mr. Umanzor-Juarez agrees with, to be clear—but permissible in the case of video interviews.

The Magistrate Judge also correctly found that "the habeas corpus statute does not address videoconferences." *Id*. at 24. In addition, the Magistrate Judge observed that "[g]iven that ICE's administrative subpoenas involve neither court testimony nor a trial, § 2241(c)(5) does not authorize the custody transfer or physical presentation demanded by ICE." *Id*. at 23. Indeed, Mr. Umanzor-Juarez explained that courts have never used writs of habeas corpus ad testificandum to compel custodians to produce those they detain for testimony requested by

[6] Reliance on the lack of "carveout for incarcerated witnesses" to find an authority to compel video interviews is puzzling. The earliest version of § 1225(d)(4)(A), passed in 1952—long before the advent of videoconferencing—cannot, under the Magistrate Judge's reasoning, be read to imply an obligation to physically produce an incarcerated person for an interview, despite the lack of alternative, remote interview options. *See* Act of June 27, 1952, Pub. L. 414, § 235(a), 66 Stat. 198. But obviously, despite having no carveout for incarcerated witnesses, Congress did not, in 1952, contemplate video interviews. That is, the fact that there is no carveout for incarcerated witnesses is immaterial to the question of whether the statute—silent as to the production of a person by any means—can be read to grant the authority ICE seeks here. It cannot.

administrative subpoena. R. Doc. 55 at 11-13. In addition, 28 U.S.C. § 2241(c)(5) "makes clear that the Writ is limited to bringing a prisoner 'into court[.]'" *Dockery v. Fisher*, No. 3:13-CV-326-WHB-JCG, 2017 WL 11681457, at *2 (S.D. Miss. July 12, 2017) (citation omitted).

The Magistrate Judge found that this very silence empowered the Court to order OPSO to facilitate video interviews. R. Doc. 56 at 24-25. However, "[w]here Congress has created a remedial scheme for the enforcement of a particular federal right," courts should "refuse[] to supplement that scheme with one created by the judiciary." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). Here, Congress created a detailed remedial scheme. An agency may seek a court order forcing the recipient of a subpoena to attend an interview, and a court may sanction the recipient if they fail to appear. Or, a party in a judicial proceeding can petition the court in that proceeding to issue a writ of habeas corpus requiring a custodian to produce a person at the court for testimony. ICE seeks to cobble these provisions together to create a new power the statutes do not authorize: it wants to compel, via administrative subpoena, a custodian to produce an individual for an interview. This position is erroneously ratified in the Order and Reasons. Congress created no remedy for agencies that seek to use their administrative subpoena power to force custodians to facilitate interviews. Mr. Umanzor-Juarez accordingly objects to the R&R on this basis, and this Court should decline to create a remedy where Congress created none.

### B. The All Writs Act Does Not Empower the Court to Enforce the Testimony Subpoenas Against OPSO.

The All Writs Act empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. A court may only issue a writ pursuant to the All Writs Act "in aid of jurisdiction previously acquired on some other independent ground." *Brittingham v. Comm'r*, 451 F.2d 315, 317 (5th Cir. 1971). Even when the court possesses jurisdiction, the Fifth Circuit construes the

All Writs Act "narrowly" and allows courts to issue writs only in "'extraordinary circumstances . . . that indisputably *demand* such a course of action as absolutely necessary to vouchsafe the central integrity of the federal court judgment.'" *Singh v. Duane Morris LLP,* 538 F.3d 334, 341 (5th Cir. 2008) (emphasis in original) (citing *Texas v. Real Parties in Interest,* 259 F.3d 387, 395 (5th Cir. 2001)).

A court's powers under the All Writs Act are limited "to the facilitation of the court's effort to manage the case to judgment." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978). If a court "is able to effect a full and complete resolution of the issues before it without resorting to the extraordinary measures contemplated under the Act, then such measures cannot be employed." *Id*. Issuance of a writ before the underlying case has been completed and the parties have exhausted all options to enforce the court's order are improper. *See, e.g., Williams v. McKeithen*, 939 F.2d 1100, 1105 (5th Cir. 1991); *MSOF Corp. v. Exxon Corp.,* 295 F.3d 485, 493 (5th Cir. 2002). A practical disadvantage incurred by a party in the absence of a writ "never has been, and under the language of the statute cannot be, a sufficient basis for issuance of the writ." *ITT Cmty. Dev. Corp.,* 569 F.2d at 60 (quoting *United States v. New York Telephone Co*., 434 U.S. 159 (1977) (Stevens, J., dissenting)); s*ee also McKeithen*, 939 F.2d at 1105 (stating the "fact that a party may be better able to effectuate its rights or duties if a writ is issued never has been, and . . . cannot be, a sufficient basis for issuance of the writ.") (citations omitted)). A party seeking a writ must demonstrate that they lack alternative means of enforcing their rights, that their right to the writ is clear and undisputable, and that the writ is appropriate under the circumstances. *See Cheney v. U.S. Dist. Ct. for D.C.,* 542 U.S. 367, 380–81 (2004).

Here, this Court has no independent jurisdiction to determine OPSO's responsibilities with respect to subpoenas issued not to OPSO, but to persons in OPSO custody. The Magistrate

Judge points out that "[t]he United States brought this enforcement action only against OPSO." R. Doc. 56 at 25. Of course, Petitioner initially directed its testimony subpoenas to OPSO and demanded that OPSO produce six named persons. *See* R. Doc. 1-2 at 18, 23, 28, 33, 38, 43. The Court had jurisdiction over that claim. However, ICE's revised subpoenas now demand that the named persons appear for ICE video appointments. R. Doc. 57-1 at 1, 5, 9, 13, 17, 21. As discussed above, 8 U.S.C. § 1225(d)(4)(B) allows this Court to enforce an administrative subpoena only against its recipient. Because OPSO is no longer the recipient of ICE's witness subpoenas, the Court no longer has jurisdiction over Petitioner's claims against it regarding the testimony subpoenas. *See generally In re Canion*, 196 F.3d 579, 584 (5th Cir. 1999) ("Federal courts must be assured of their subject matter jurisdiction at all times.").

Even if this Court does have jurisdiction over OPSO with respect to ICE's witness subpoenas, Petitioner has not met its burden under *Cheney* of proving any absence of alternative means to enforce its subpoenas, an indisputable right for a writ to issue, or extraordinary circumstances warranting issuance. 542 U.S. at 380-81. First, as noted in the Order and Reasons, "[t]he witnesses named in the subpoenas remain free to object to testifying. If necessary, the Court can rule on those objections at the proper time." R. Doc. 56 at 25. Petitioner could simply wait and see if the recipients will comply with the testimony subpoenas and if OPSO will facilitate video meetings on its own accord. After all, a new Orleans Parish Sheriff has recently assumed the office. *Id.* at 1. Sheriff Woodfork may take a different approach than that of her predecessor. In addition, Petitioner has not yet brought any enforcement or contempt action against the six named persons. As such, any use of the All Writs Act here is premature.

Second, Petitioner has not shown any clear and undisputable right to a writ. The most Petitioner can show is that 8 U.S.C. § 1225(d)(4) and 18 U.S.C. § 2241(c)(5) are silent as to any

third-party obligation to facilitate videoconferences. *See* R. Doc. 56 at 24-25. That silence arguably confirms that Congress did not intend for third parties to bear any such obligation; Petitioner certainly has not affirmatively established its indisputable right to have this purported obligation enforced by this Court.

Finally, the All Writs Act is not a tool with which the Court may right any perceived wrong. Rather, the Act must be used sparingly and only when necessary. Issuance of a writ here would not serve in preserving this Court's jurisdiction. It would only serve to expeditiously enforce ICE's subpoenas by allowing the agency to short-circuit the enforcement process laid out by Congress. Petitioner did not—because it could not—cite any authority in which the All Writs Act has been used in such a way. In addition, a ruling that a third-party has an obligation to facilitate a subpoena interview between an agency and the subpoena's recipient would be unprecedented and upend over a century of administrative subpoena jurisprudence. Therefore, significant discretionary factors counsel against issuance of a writ in this case. In sum, the Act does not provide a vehicle by which the Court may order OPSO's to facilitate video interviews.

**<u>Objection 2</u>: The Magistrate Judge Erred in Finding that ICE's List Subpoena Is Authorized by Statute.**

In objecting to the revised subpoenas Petitioner filed with the court on March 24, 2026, OPSO argued that ICE's subpoena for lists of suspected noncitizens within OPSO custody exceeded the scope of 8 U.S.C. § 1225(d)(4) because the subpoena did not name the persons ICE sought to investigate. R. Doc. 44 at 4-6. The Magistrate Judge found this argument untimely because OPSO first raised it in its post-hearing brief. R. Doc. 56 at 13. The Magistrate Judge also found that the list subpoena complied with 8 U.S.C. § 1225(d)(4) because the evidence it sought was relevant to a lawful purpose. *Id*. at 14-16. Both findings are incorrect.

### A. OPSO's and Mr. Umanzor-Juarez's Arguments Are Timely.

A party generally waives arguments not presented to a Magistrate Judge. *See Freeman v. County of Bexar*, 142 F.3d 848, 851 (5th Cir. 1998). However, a court "has wide discretion to consider and reconsider the magistrate judge's recommendation," and "[i]n the course of performing its open-ended review, the district court need not reject newly-proffered evidence simply because it was not presented to the magistrate judge." *Id*. at 852**.** Therefore, "[a] district court may entertain additional arguments or facts not raised first before the magistrate in cases if a party's new assertion amplifies upon an already existent claim." *Quezada v. Avoyolles Corr. Ctr.*, No. CIV.A. 15-781, 2015 WL 5061230, at *5 (E.D. La. Aug. 17, 2015).

In OPSO's initial brief, it argued that the list subpoenas exceeded statutory authority because they required OPSO to generate the lists. *See* R. Doc. 19 at 14-15. After the Court's show cause hearing, ICE added a request for information from twenty fields of OPSO's database to its list subpoena. R. Doc. 43-1 at 23. In response, OPSO objected to the subpoena on the grounds that it was an unreasonably broad demand for information concerning unknown persons, and that § 1225(d)(4) did not allow such "John Doe" requests. R. Doc. 44 at 4-6. That is, when the subpoena's stunning breadth became clear, OPSO objected to it. As such, OPSO timely presented its arguments.

Even if this Court finds that OPSO's arguments were untimely, the Court may still consider them because OPSO made the arguments before the Magistrate Judge issued her decision. In addition, OPSO's post-hearing arguments amplify its broader, earlier argument that ICE's list subpoena lacked statutory authority. *See* R. Doc. 19 at 14-15 ("The fact that ICE's 'roster' subpoenas, like the witness-production subpoenas, were not issued on Form I-138…reinforces that these subpoenas are invalid.") (citations omitted). Mr. Umanzor-Juarez also

argued that longstanding administrative practice demonstrated that the statute did not authorize the list subpoenas. R. Doc. 55 at 9-11. Even if OPSO's arguments were untimely, Mr. Umanzor-Juarez's was not.

**B. Section 1225(d)(4) Does Not Authorize John Doe Subpoenas.**

The Magistrate Judge found that an agency may use subpoenas to "go fishing" as long as its actions comply with the *Morton Salt* requirements, and the purpose is related to a legitimate investigatory purpose. R. Doc. 56 at 13. As a general matter, this is correct. At the same time, courts may only enforce administrative subpoenas if "the subpoena is within the statutory authority of the agency" and "the demand is not unreasonably broad." *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.,* 983 F.2d 631, 638 (5th Cir. 1993) (citing *Morton Salt*, 338 U.S. at 652).

Both OPSO and Mr. Umanzor-Juarez explained why a demand for names and information about unnamed persons who are unknown to the agency exceed § 1225(d)(4)'s scope and is unreasonably broad. OPSO argued that ICE's regulation requiring that it issue subpoenas on Form I-138 confirms that the statute does not authorize demands for lists of suspected noncitizens. R. Doc. 44 at 5. The form requires its issuer to complete fields listing the name and alien file number of a particular person. *Id*. Mr. Umanzor-Juarez also raised this argument. R. Doc. 55 at 9-11. ICE's traditional understanding that subpoenas aid investigation of specific, named persons is important because the "longstanding 'practice of the government'. . . can inform [a court's] determination of 'what the law is.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *N.L.R.B. v. Noel Canning,* 573 U.S. 513, 525 (2014)).As such, ICE's own regulation and use of a form requiring that subpoenas be linked to

investigations of a specific person confirm that the statute does not empower ICE to fish for information concerning unknown persons.

OPSO also reported that the Ninth Circuit, in *Peters v. United States*, 853 F.2d 692 (9th Cir. 1988), rejected ICE's previous attempt at using subpoenas to demand lists of unknown persons. *See* R. Doc. 44 at 5-6. The *Peters* court found that subpoenas to a landlord requesting documents concerning unnamed, potentially removable tenants constituted an overbroad fishing expedition and exceeded statutory authority. *Peters*, 853 F.2d at 699-700. Indeed, none of the cases cited by the Magistrate Judge sanction the use of administrative subpoenas unconnected to existing investigations. Here, ICE had no reason to believe that any person whose information would be on any list produced by OPSO is removable.

The agency currently seeks a list populated with the information of all persons for whom OPSO's database does not have a driver's license number, a social security number, state of birth, or United States citizenship fields completed. R. Doc. 57-1 at 32. Of course, many United States citizens do not have driver's licenses. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 231 (2008) (Souter, J., dissenting) (quoting an op-ed essay from the former President and former Secretary of State that noted approximately 12 percent of citizens lack a driver's license). Even more concerning, OPSO averred that the state-of-birth field has not been completed for any inmate in more than a decade. Exhibit 1, Transcript of Oral Argument Proceedings March 17, 2026, at 25:8-15. As such, by the terms of the subpoena, OPSO must produce a complete list of the personal information of all persons in its custody. Congress did not authorize ICE to demand unfettered access to law enforcement databases in the hope that some of the information would be useful in beginning investigations into yet unknown persons.

**Objection 3: ICE's Testimony Subpoenas Violate the Anticommandeering Rule.**

The Tenth Amendment's anticommandeering rule recognizes that the Constitution "withhold[s] from Congress the power to issue orders directly to the States." R. Doc. 56 at 7 (quoting *Murphy v. NCAA*, 584 U.S. 453, 470 (2018)). Courts, therefore, must construe 8 U.S.C. §1225(d)(4) to avoid the result of commandeering.

The Magistrate Judge determined that ICE could avert a commandeering problem by revising the subpoenas to eliminate that OPSO physically transport an individual to ICE's offices and, instead, require only that OPSO facilitate videoconference interviews. R. Doc. 56 at 25-26. But for reasons recognized elsewhere in the Order and Reasons, this conclusion is erroneous.

With respect to list subpoenas, the Magistrate Judge determined that a revised ICE subpoena that seeks only raw data "is not demanding that OPSO address a federal problem, nor administer a federal regulatory program . . . nor is ICE insisting that OPSO analyze the data that it collects." *Id*. at 16-17. Therefore, the Magistrate Judge determined, the list subpoena would be free of Tenth Amendment defects and enforceable. *Id*. at 17-19. But the Magistrate Judge correctly recognized that the subpoenas as originally issued were invalid because they would require OPSO to analyze which incarcerated people "failed to provide verifiable identity documents that correspond to lawful presence in the United States." *Id.* at 11. The court accordingly declined to recommend enforcement of that portion of the list subpoena.

The same rationale should apply to the testimonial subpoenas. Subpoenas requiring OPSO to accommodate interviews through videoconferencing violate the anticommandeering rule. Just as ICE may not compel OPSO to use its resources to analyze data, neither should it require OPSO use its resources to facilitate videoconferences for ICE's convenience.

To facilitate these interviews, OPSO would use their own videoconferencing equipment—possibly taking available conferencing time away from attorney visits or court appearances for people charged with crimes—which is paid for and maintained by OPSO. It would require an already-strained jail staff[7] to take on duties in service of ICE and completely unrelated to the work of the OPSO, which is in no position to take on additional tasks to fulfill the priorities of the federal government. To require them to do so is commandeering.

However, the extent of the burden is not the central issue in this instance. ICE seeks to force Mr. Umanzor-Juarez's appearance through the compelled action of Sheriff Woodfork and to use OPSO staff and resources in service of its immigration priorities. In *Printz*, 521 U.S. at 904, the federal government sought, through the Brady Act, to command local law enforcement officials to temporarily conduct background checks for firearm purchases until a federal system could be put into place. Local law enforcement officials filed action to block the interim provision, and contended congressional action compelling state officers to execute federal laws was unconstitutional. *Id*. at 905. Though the United States argued that the Brady Act served an important purpose, and that the interim period checks placed "a minimal and only temporary burden upon state officers," *id*. at 931-32, the Supreme Court determined:

> There is considerable disagreement over the extent of the burden, but we need not pause over that detail. Assuming *all* the mentioned factors were true, they might be relevant if we were evaluating whether the incidental application to the States of a federal law of general applicability excessively interfered with the functioning of

[7] *See Louisiana v. Hutson*, 2006 WL 1256265 at *1 (quoting a letter from former Sheriff Hutson that stated OPSO was "experiencing real operational constraints" including "complicated budgeting and significant staffing challenges" in explaining why incarcerated people were not being brough to court.); *see also* 4WWL, *Audit exposes security lapses at Orleans Parish jail amid rising overtime costs*, April 10, 2026, https://www.wwltv.com/article/news/local/orleans/audit-exposes-security-lapses-at-orleans-parish-jail-amid-rising-overtime-costs/289-bdd80ce3-02d6-4908-85db-01c9812f7265, last visited 6/4/26. A report from the Louisiana Legislative Auditor found that OPSO was understaffed and that OPSO had attempted to fill staffing gaps with the use of overtime, which created security concerns. Louisiana Legislative Auditor, *Finances, Staffing, and Jail Security Operations, Orleans Parish Sheriff's Office*, 4/8/2026, app.lla.state.la.us/publicreports.nsf/0/51b06899f3569ecf86258dd200757bbf/$file/0000a417.pdf?openelement&.7773098, last visited 6/4/26.

> state governments. But where, as here, it is the whole *object* of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a "balancing" analysis is inappropriate.

*Id*. at 932 (citations omitted).

In addressing whether the modified *list* subpoena presented a commandeering problem, the Magistrate Judge noted that, in *Printz*, the Supreme Court "emphatically declined to address whether information-sharing directives violated the anticommandeering rule" and that the issue before it was instead "forced participation of the States' executive in the actual administration of a federal program." R. Doc. 56 at 16 (citing *Printz*, 521 U.S. at 918). But the *testimony* subpoenas do not merely require the provision of data. They require OPSO's participation in ICE's investigation, demanding that OPSO produce people for the purpose of eliciting testimony and ensure the continuing operability and availability of technology. Enforcing the testimony subpoenas would force OPSO to divert its limited staff time and videoconferencing resources from its own priorities towards those of ICE; *Printz* applies, and it demands the conclusion that the testimony subpoenas, even if limited to videoconferencing, would violate the anti-commandeering rule if enforced.

**<u>Objection 4</u>: The Magistrate Judge Erred in Finding that ICE's Subpoenas Were Issued for a Proper Purpose.**

All three categories of subpoenas ICE issued to OPSO—testimonial, document, and list—were issued for an improper purpose, and this Court should decline to enforce them. The Magistrate Judge properly found that "courts will not enforce a subpoena if doing so is an abuse of the judicial process," and that "[a]n abuse of judicial process may take place when subpoenas were issued for an improper purpose, 'such as to harass [the recipient] or to put pressure on [the recipient] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" R. Doc. 56 at 14 (quoting *United States v. LaSalle Nat. Bank*, 437 U.S.

298, 313–14 (1978)). However, the Magistrate Judge found that OPSO's argument that ICE issued the subpoenas for an improper purpose was mooted by the Court's order to modify those subpoenas. *Id*. at 14-15. In addition, the Magistrate Judge rejected Mr. Umanzor-Juarez's argument that ICE acted with the improper purpose of coercing OPSO to violate the *Cacho* consent decree. *Id*. at 15-16. Both holdings are erroneous.

**A. The ICE Subpoenas Were Issued for the Improper Purpose of Coercing OPSO into Prematurely Violating a Collateral Consent Decree.**

The Magistrate Judge rejected Mr. Umanzor-Juarez's arguments regarding the driving, improper purpose of the subpoenas because "[b]y their very nature . . . subpoenas can be coercive. ICE's use of subpoenas to obtain information over OPSO's objection is not an improper purpose." *Id*. at 15. The Order and Reasons show no consideration, however, of the evidence Mr. Umanzor-Juarez presented indicating that ICE issued its subpoenas for the improper purpose of pressuring OPSO to cease compliance with the *Cacho* consent decree. The purpose of a subpoena is to inquire. *See United States v. Clarke,* 573 U.S. 248, 254 (2014).ICE's subpoenas must therefore be found unenforceable because they were issued not to inquire, but to force OPSO to change a policy mandated by this Court.

If ICE were motivated only by a desire to obtain information, the subpoenas would be lawful. But any subpoenas issued with the intent to coerce OPSO into cooperating with detainer requests, in violation of the *Cacho* consent decree, would be unlawful. *See Burlington N. R.*, 983 F.2d at 638 (holding that courts must quash subpoenas if the *Morton Salt* "requirements are not met *or* if the subpoena was issued for an improper purpose") (emphasis added). Mr. Umanzor-Juarez did not claim that ICE subpoenas issued for the purpose of obtaining information from OPSO would be improper. Rather, he argues specifically that ICE "is using these subpoenas as a cudgel to coerce OPSO into adopting ICE's preferred detainer policy." R. Doc. 55 at 17.

As explained in Mr. Umanzor-Juarez's memorandum, an ICE detainer is "a request for a law enforcement agency to hold a noncitizen past their release date so that ICE may arrest them." *Id*. at 2 n.1 (citing 8 C.F.R. § 287.7). Compliance with ICE detainers is voluntary. R. Doc. 56 at 3 (citing *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018)). Mr. Umanzor-Juarez explained that this Court's active consent decree in *Cacho* governs OPSO's detainer policy and requires it to decline ICE detainer requests in many circumstances. R. Doc. 55 at 19-20. The Order and Reasons does not address Mr. Umanzor-Juarez's contention, *id.* at 16-22, that ICE issued the instant subpoenas not to obtain information about or even custody of certain people, but rather the broader, improper purpose of coercing OPSO into adopting a policy of compliance with ICE detainers in violation of *Cacho*.

The Magistrate Judge concluded that "[t]he uncontroverted record confirms ICE is investigating OPSO inmates who may lack legal status." R. Doc. 56 at 16. The Order and Reasons does not address Mr. Umanzor-Juarez's evidence of the federal government's statements and executive actions targeting jurisdictions that decline voluntary detainers, its broader pattern of targeting those jurisdictions with a deluge of subpoenas, and ICE's public and private statements concerning OPSO's lack of detainer cooperation. Mr. Umanzor-Juarez demonstrated that this targeting comes from the highest office in the federal government, explaining that President Trump repeatedly and publicly proclaimed his desire to prevent local jurisdictions from adopting policies limiting cooperation with voluntary detainers. R. Doc. 55 at 17. He noted that a 2025 executive order directed federal agencies to withhold funding from these jurisdictions, and that the agencies withheld funding from New Orleans on this basis. *Id*.

Mr. Umanzor-Juarez also cited a review of thousands of ICE subpoenas that concluded that the agency has a practice of targeting jurisdictions that limit detainer cooperation by

flooding them with subpoenas and negative public relations campaigns. *Id*. at 18. ICE engages in this practice with the purpose of pressuring jurisdictions into returning to "previous levels of cooperation." *Id*. Mr. Umanzor-Juarez also pointed to evidence that ICE targeted OPSO, including multiple statements by ICE condemning OPSO for its detainer policy. *Id*. at 19. These statements include one by DFOD Acuna to CBS News that ICE was working "every day" to get "better cooperation" from OPSO. *Id*. (citing Weis, n. 4, *supra*).

Mr. Umanzor-Juarez also highlighted DFOD Acuna's repeated entreaties to OPSO to abandon its *Cacho* detainer policy. *Id*. But the decree remains in effect. *See Cacho*, 2026 WL 456587, at *10. In a discussion with OPSO concerning the instant subpoenas, DFOD Acuna urged OPSO to "honor each and every detainer that ICE files and that ICE has already filed" and enter into a "287(g)" agreement. R. Docs. 1-2 at 68; 55 at 20. A 287(g) agreement represents the highest level of cooperation between a local law enforcement agency and ICE. Under such an agreement, the local agency's officers can perform ICE functions "under ICE training and supervision" pursuant to 8 U.S.C. § 1357(g). R. Doc. 56 at 3-4. However, "municipalities may not be required to enter into these agreements." *City of El Cenizo,* 890 F.3d at 177; 8 U.S.C. § 1357(g)(9).

The Magistrate Judge also noted that OPSO does not cooperate with ICE because of the *Cacho* decree—and that the decree remained in effect, R. Doc. 56 at 4-5—but held that the instant litigation is not collateral to any other because "ICE's enforcement action arises directly from its dispute with OPSO about sharing inmates' information." *Id.* at 15 n. 32.

Mr. Umanzor-Juarez's evidence demonstrates that these subpoenas *are* a collateral attack on the *Cacho* decree. By law, ICE cannot compel OPSO to cooperate with detainer requests or enter into a 287(g) agreement. Both are voluntary. And as acknowledged in the Order and

Reasons, OPSO could not change its detainer policy even if it wanted to because of this Court's order in *Cacho*. Petitioner tried and failed to obtain an order from this Court to end the *Cacho* decree. *See Cacho*, E.D. La. Case No. 11-cv-225, R. Docs. 134 and 146; 2026 WL 456587, at *10. So, ICE sought to achieve through its subpoena power what it has been unable to win through litigation: full OPSO compliance with ICE's voluntary detainer program. This collateral purpose is not a lawful exercise of ICE's investigatory power.

**B. OPSO's Improper Purpose Arguments Are Not Moot.**

Courts must inquire as to the agency's motive in issuing the subpoenas to determine "whether the agency is honestly pursuing the goals of the" statute granting the agency its subpoena powers. *LaSalle Nat. Bank,* 437 U.S. at 316. When analyzing such claims, "[t]he timeline tells the story." *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1302 (W.D. Wash. 2025). That is, courts look to the statements and actions of the government before and immediately after the issuance of subpoenas to determine whether the agency's purpose was proper. *Id.*; *see also In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-mc-00063-SKC-CYC, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) (finding that the government's conduct before and during subpoena enforcement litigation "paint[ed] a compelling picture illustrating that the government's aim [was] not actually to investigate . . . violations, but to use the [law] as a smokescreen for its" policy objective of ending pediatric gender-affirming care). The Fifth Circuit, too, looks to the purpose of a subpoena "at its inception" and to subsequent agency justifications to determine if they "were merely post-hoc rationalizations." *Burlington N. R.,* 983 F.2d at 640-41.

A court's subsequent modification of a subpoena therefore cannot have any bearing on the intentions of an agency at the inception of those subpoenas. Neither Petitioner nor the Order

and Reasons cite any authority indicating that the Court may cure subpoenas issued with improper purpose.

Instead, "[i]t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58. When that process is abused, courts must deny enforcement. *See Burlington N. R.,* 983 F.2d at 643 (declining to enforce an administrative subpoena improperly issued for a purpose outside statutory authority). As such, the proper course for a court when confronted with subpoenas issued for improper purpose is to quash, rather than remediate, those subpoenas.

**C. Issuing Subpoenas with the Purpose of Arresting Witnesses Is Improper.**

Mr. Umanzor-Juarez does not endorse OPSO's argument that ICE issued its subpoenas to coerce OPSO into bringing its detainees to ICE's office for arrest. Mr. Umanzor-Juarez alleges the more ambitious purpose of pressuring OPSO into violating the *Cacho* consent decree. But if the Court determined that ICE's motivation was the arrest of those named in the subpoenas, that purpose would also be improper.

An agency's subpoena powers are not inherent. "An administrative agency's authority to issue subpoenas is a creature of statute." R. Doc. 56 at 6 (quoting *Source for Pub. Data*, 903 F.3d at 458). Therefore, agencies exercising their subpoena powers do not have "unfettered authority to cast about for potential wrongdoing." *Source for Pub. Data,* 903 F.3d at 460 (quoting *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994)). Rather, a subpoena is enforceable only if it is "issued for lawful purpose within the statutory authority of the issuing agency." *Winters Ranch Partnership*, 123 F.3d at 329. Therefore, subpoenas issued for reasons outside of Congress' statutory purpose are improper. *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *10 (finding subpoenas issued to investigate provision of

gender-affirming care were unenforceable due to lack of statutory authority, despite executive branch policy disfavoring gender-affirming care). It is of no import if the agency has a facially legitimate reason for issuing a subpoena if that reason is "a smokescreen for its true [improper] objective." *Id*. at *7.

Congress' grant of subpoena authority to ICE empowers the agency to investigate matters relating to a person's right to be in the United States and "concerning any matter which is material and relevant to the enforcement of" the INA. 8 U.S.C. § 1225(d)(4)(A). But a broad grant of authority is not an unlimited one. The Magistrate Judge correctly found that the statute unambiguously does not empower ICE to demand that OPSO transport persons to ICE. R. Doc. 56 at 24. The right of a law enforcement agency to refuse such cooperation is protected by both the Tenth Amendment's anti-commandeering principle and the INA itself. *See City of El Cenizo* , 890 F.3d at 178 ("Federal law does not suggest the intent . . . to prevent states from regulating *whether* their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all."); 8 U.S.C. § 1357(g)(9). As such, any subpoenas issued for the purpose of compelling OPSO's to transfer persons named therein to ICE would be subpoenas issued for an improper purpose not authorized by Congress.

The fact that ICE chose to modify its subpoenas after the court found they must be modified to be enforceable does not change ICE's initial improper purpose. Mr. Umanzor-Juarez accordingly objects to the finding that the subpoenas were issued according to proper purpose and are enforceable on that basis.

## CONCLUSION

For the forgoing reasons, Mr. Umanzor-Juarez respectfully requests that this Court review the Magistrate Judge's recommendations *de novo*, find that ICE's administrative subpoenas are unlawful, and quash those subpoenas.

Date: June 5, 2026

Respectfully submitted,

*/s/ Susan Meyers*

**Susan Meyers** (La. Bar No. 29346)
**Julia Mudd** (La. Bar No. 40886)
SOUTHERN POVERTY LAW CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel. (Meyers): (504) 512-8649
Tel. (Mudd): (504) 401-2291
susan.meyers@splcenter.org
julia.mudd@splcenter.org

**Jeremy Jong***
New Jersey Bar No.: 066472014
AL OTRO LADO
634 S Spring Street, Suite 908
Los Angeles, California 90014
Tel.: (504) 475-6728
jeremy@alotrolado.org

* *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ Susan Meyers